JAMES BARKER, as Guardian ad Litem of GEORGE BARKER, an Infant, et al., Appellants, v ABDULLAH KALLASH et al., Defendants, and DANIEL MELUCCI, SR., et al., Respondents.

Second Department, February 7, 1983

APPEARANCES OF COUNSEL

*Marvin Suss* (*Richard T. Farrell* of counsel), for appellants.

*J. Robert Morris* (*Jeffrey S. Rovins* of counsel), for respondents.

OPINION OF THE COURT

NIEHOFF, J.

On this appeal we are called upon to determine whether one who is injured while engaged in a concededly wrongful act, the making of a "pipe bomb", may maintain an action against his alleged cohorts and contraband suppliers in order to recover money damages for the injuries sustained. Inasmuch as a recovery in such case would result in allowing one who was committing wrongful conduct injurious to the public interest to recover money damages which were caused by his own wrongdoing, we hold that the action is not maintainable in the courts of this State.

Accordingly, we affirm the order of Special Term which granted defendants Meluccis' motion for summary judgment dismissing the complaint as to them.

The plaintiffs, James Barker as guardian ad litem of George Barker, an infant over the age of 14, and James Barker on behalf of himself, commenced this action against the defendants in order to recover for personal injuries sustained by the infant. The complaint consists of four causes of action.

In the first cause of action it is alleged that on June 26, 1976 the infant plaintiff was on the Kallash property when "he was seriously injured by an explosion of fire-crackers or a container created from said firecrackers". In said cause of action it is claimed that the infant defendants Ayman and Anas Kallash had bought firecrackers with the knowledge of the defendants Abdullah and Aziza Kallash, their parents, removed the powder from the firecrackers, and placed it into the container which ultimately exploded in George Barker's hands.

In the second cause of action it is alleged that infant defendant Daniel Melucci, Jr., and his parents, Daniel Melucci, Sr., and Joanne Melucci, are liable to George Barker because Daniel Melucci, Jr. (nine years of age at the time) sold the firecrackers in question to Ayman and Anas Kallash.

In the third cause of action it is alleged that infant defendant Robert Judge and his mother Lillian Judge are liable to George Barker because sometime prior to the date of the accident Robert Judge sold the fireworks to infant defendant Daniel Melucci, Jr.

The fourth cause of action is a derivative cause on behalf of the plaintiff father, James Barker.

Examinations before trial were conducted of plaintiff George Barker and a number of the defendants. Different versions of the incident in question were given by the parties.

According to plaintiff George Barker (hereinafter plaintiff), on the afternoon of June *25*, 1976, at which time he was almost 15 years of age, he was in the backyard of *his* home with both Ayman Kallash and Anas Kallash. To-

wards the end of the afternoon the three youths yearned for a bigger "bang" so they decided to make a "pipe bomb" which was to be constructed of a three- to four-inch length of pipe approximately one inch in diameter. The pipe was grooved and was to be secured by a screw cap at each end. Plaintiff obtained the pipe and metal caps from his father's workshop, which workshop also contained powder used for loading shotgun shells by hand. However, he denied that such powder was used in making the pipe bomb. Before assembling the bomb, plaintiff drilled a hole in the pipe in order to insert a fuse. While he was getting the pipe and caps, Anas Kallash and Ayman Kallash were returning from their home with gunpowder and firecrackers, respectively, which plaintiff had told them to procure. While plaintiff held the pipe, Ayman Kallash poured the gunpowder into it. Plaintiff then screwed one cap to the pipe and, while attempting to screw the second cap to the pipe, it exploded causing serious injury to both his hands.

The Kallash brothers' version of the incident differs in a number of ways from that given by plaintiff. However, for the purposes of this appeal, we will accept the plaintiff's version of the incident.

Defendants Daniel Melucci, Sr. and Joanne Melucci moved for summary judgment dismissing the complaint on the grounds that "(1) no evidence admissible against defendants exists to prove the allegations of plaintiff's complaint, and (2) plaintiff, by virtue of his wrongful and illegal conduct, is barred from recovering for any damages sustained while engaged in such conduct".

In granting the motion for summary judgment dismissing the complaint against said defendants, Special Term wrote:

"George Barker, by participating in the making of a pipe bomb was engaged in wrongful if not illegal conduct (see Penal Law, §§ 265.02 and 270.00, subd 2 [b] [i]). The well-settled public policy of this state as initially expressed by the Court of Appeals in the case of *Riggs v Palmer* (115 NY 506, 511-512) is that:

" 'No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own

crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statute'

"The courts of this state have consistently applied this rule by refusing to allow a party to establish a claim based on his own wrongful conduct (see, e.g., *Stone v Freeman,* 298 NY 268, 271; *Carr v Hoy,* 2 NY2d 185, 187-188; *McConnell v Commonwealth Pictures Corp.,* 7 NY2d 465, 471; *Reno v D'Javid,* 55 AD2d 876, 877, affd 42 NY2d 1040; *Matter of Hines v Sullivan,* 105 Misc 2d 288, 289). As stated by the Court of Appeals in *Carr v Hoy (supra,* p 188), 'We are closing our courts to one who would prove his own wrongdoing as a basis for his supposed "rights" '.

"The fact that New York now has a comparative negligence or fault statute (CPLR 1411) would have no bearing upon this established public policy. We have here a question not of George Barker's own fault, vis-à-vis that of defendants, but rather an issue of Barker's conduct being such that in the first instance he is precluded from bringing a lawsuit based thereon.

"Accordingly, defendants Daniel and Joanne Melucci's motion for summary judgment dismissing the complaint against them is granted."

On appeal the Barkers assert that contrary to Special Term's conclusion, the conduct of plaintiff does not preclude recovery in this case. More specifically, it is claimed that plaintiff's conduct is not the kind of wrongful conduct condemned by *Riggs v Palmer* (115 NY 506, *supra*) and that, in any event, the arrival of comparative fault in New York State, via CPLR article 14-A, permits the maintenance of this action notwithstanding plaintiff's own wrongdoing.

As the record now stands before us it is clear that plaintiff was engaged in unlawful conduct at the time of this accident. Indeed, in the Barkers' brief it is conceded that plaintiff was engaged in "wrongdoing" while he was making the pipe bomb. As a result, the legal issues before us have been narrowed and we must focus our attention on whether the wrongdoing of plaintiff is the sort of conduct

toward which the rule of *Riggs v Palmer* (*supra*) is directed and, if so, whether that rule has been abrogated by the adoption in New York of a comparative fault statute.

In *Riggs v Palmer* (*supra*), the defendant Elmer Palmer murdered his grandfather Francis B. Palmer in order to keep him from revoking provisions in his will favorable to the defendant, and presumably to take the property earlier than nature would have permitted. The Court of Appeals (p 511) held that the public policy of this State required that Palmer not be allowed to profit from his wrongdoing and set forth the fundamental maxim of common law that: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime."

Through the years the maxim has been interpreted to preclude a derivative action brought by a plaintiff whose negligence caused injury to his spouse (*McKay v Syracuse Rapid Tr. Ry. Co.,* 208 NY 359, 364); utilized to prevent unjust application of the Statute of Frauds (*Imperator Realty Co. v Tull,* 228 NY 447, 457; *Keystone Hardware Corp. v Tague,* 246 NY 79); and applied to prevent those engaged in illegal activities such as gambling (*Hofferman v Simmons,* 290 NY 449), bribery (*Stone v Freeman,* 298 NY 268, *supra; McConnell v Commonwealth Pictures Corp.,* 7 NY2d 465, *supra*), public indecency (*Carr v Hoy,* 2 NY2d 185, *supra*), the unlawful practice of law (*Spivak v Sachs,* 16 NY2d 163), or pornography (*Braunstein v Jason Tarantella, Inc.,* 87 AD2d 203) from invoking the aid of the courts to obtain ill-gotten moneys.

In *Reno v D'Javid* (55 AD2d 876, affd 42 NY2d 1040, *supra*), the Appellate Division, First Department, summarily dismissed the plaintiff's causes of action based upon medical malpractice, breach of warranty, and assault because they arose out of an illegal abortion performed by the defendant physician which the plaintiff had requested. That court held (p 877) that "[p]laintiff, having participated in an illegal act, may not profit therefrom", and closed the doors of our courts to the plaintiff citing the above-quoted language from the *Riggs* case. In affirming, the Court of Appeals noted (p 1040) that the "more grievous violation at issue is not that of the statute prohibiting

abortions, itself the object of a changing legislative view, but of the paramount public policy imperative that the law, whatever its content at a given time or for however limited a period, be obeyed".

Thus, the doctrine has been applied not only to wrongful conduct which is profit motivated, but also to prevent recovery by a plaintiff for personal injuries sustained while that person was engaged in wrongdoing which is violative of fundamental public policy.

We are of the view that there is no reasonable escape from the conclusion that the making of a pipe bomb is the type of wrongdoing which constitutes an egregious violation of fundamental public policy, and that such conduct falls within the parameters of the *Riggs* doctrine.

The kind of activity in which plaintiff was engaged when injured cannot be passed off lightly as mere prankish or foolish conduct. That is, one embarked upon the construction of a pipe bomb cannot be heard to assert that he has done nothing more grievous than commit a slight offense against the public well-being and safety, which should be ignored or overlooked by the courts. Certainly, this case constitutes a striking illustration of the potential for grave harm to life and limb that such a dangerous instrumentality possesses, and is the most powerful of evidence in support of the conclusion that pipe bomb making, which has been condemned by the Penal Law, is beyond any doubt injurious to the public interest.

Long ago, Judge CARDOZO recognized that one of the most fundamental obligations of the judiciary is the duty to deny litigants the assistance of the courts when judicial intervention "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal" (*Loucks v Standard Oil Co. of N. Y.*, 224 NY 99, 111). Clearly, the various cases cited above and Judge CARDOZO's language in the *Loucks* case lay down the proposition that the courts should be righteously indignant and withhold their aid whenever the plaintiff's right to recover is founded upon proof that plaintiff has committed acts which are patently violative of public policy, or which constitute an obvious

menace to the public welfare. We hold that the present case falls squarely within the rule.

Having decided that the plaintiff's conduct at the time he was injured is the type of wrongdoing at which the *Riggs* doctrine is directed we must next determine whether the doctrine remains viable in the face of CPLR article 14-A, New York's "comparative negligence" statute.

The statute (CPLR 1411) provides that in any action to recover damages for personal injury where either contributory negligence or assumption of risk is asserted as a defense, that defense shall not bar recovery, but damages will be diminished in the proportion which the culpable conduct attributable to the claimant bears to the culpable conduct which caused the damages. The 1975 Judicial Conference Report on the CPLR noted that the phrase culpable conduct as used in the statute is "broad enough to encompass not only negligence but also other breaches of legal duties" (Twenty-first Ann Report of NY Judicial Conference, 1976, p 240), which has led one commentator to state that "[p]resumably this logic may also permit a plaintiff to recover despite his involvement in an intentional wrong" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1411.1, pp 385, 386). Judge McLAUGHLIN's presumption was cited favorably by the Appellate Term, First Department, in the case of *Lomonte v A & P Food Stores* (107 Misc 2d 88, 89) in which the plaintiff was injured while he was in a physical altercation with one of defendant's employees over a shopping cart. In that case the Appellate Term upheld the jury's findings that the plaintiff was 75% contributorily negligent and the defendant only 25% negligent and held that: "Although we have found no case in which a plaintiff guilty of an intentional wrong has recovered damages apportioned pursuant to CPLR 1411, we believe the rationale expressed in the above-quoted commentaries to McKinney's CPLR 1411 is sound and we thus conclude that the plaintiff may recover on the basis of the percentage of negligence which the jury ascribed to the defendant" (107 Misc 2d, at p 91).

Based on the above, the Barkers assert that plaintiff's conduct, be it characterized as criminal or not, merely

bears on the percentage of fault attributable to them. In our opinion the interpretation the plaintiffs seek to place on the *Lomonte* decision is tortured and simplistic. Surely, it cannot be argued seriously that the comparative negligence statute now permits any wrongdoer, be he a murderer, rapist or bomb maker, to recover, at least in part, once he establishes some fault on behalf of one or more of his partners in wrongdoing.

While it is true that the Practice Commentary quoted above speaks in terms of "intentional wrong", this term cannot be taken out of context and be expanded to include intentional wrongdoing of the grievous type involved in the present case. At the very most the above phrase is intended to include acts denominated as intentional torts within the ambit of the comparative negligence statute and not intentional, wrongful, criminal acts which are highly dangerous to the public. Any other reading of these words would be divorced from reality. We are not prepared to say that the Legislature, whose acts must be viewed through the eyes of reason and common sense, intended such a sweeping and radical result when it sought to ameliorate the rigid consequences which flowed from the now replaced contributory negligence and assumption of risk doctrines.

Indeed, one need look no further than the *Riggs* case itself to buttress the conclusion that a statute which merely permits the recovery of damages when contributory negligence, assumption of risk, or similar culpable conduct is established cannot fairly be construed to enable a party deliberately engaged in a form of conduct denounced by the Penal Law, because it undeniably threatens the safety and well-being of the public, to recover damages caused him while engaged in such wrongdoing. For, as stated in *Riggs* (115 NY 506, 511-512, *supra*): "[A]ll laws as well as contracts may be controlled in their operation and effect by general, fundamental maximums of the common law * * * These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statute."

Moreover, we cannot lose sight of the fact that the *Riggs* doctrine applies here because the plaintiff was engaged in

conduct detrimental to the public interest, and not because his conduct caused injury to himself. The issue of whether or not the rules of contributory negligence, assumption of risk, or similar types of culpable conduct, continue in existence is hardly relevant. Those rules arise in diminution of damages only after a plaintiff has established his right to recover. Under the *Riggs* doctrine, a plaintiff guilty of the type of wrongdoing condemned by that case and its progeny may not enter the courtroom because its doors are closed to him so that the comparative conduct statute does not come into play. We are convinced that in enacting New York's comparative fault statute the Legislature did not intend to abrogate the fundamental principles enunciated in *Riggs,* which are deep-rooted in a long-standing public policy of this State.

To sum up: to allow one engaged in the wrongful act of manufacturing a pipe bomb to maintain an action to recover damages for injuries sustained when the illegal instrument exploded would be to sanction or condone a significant violation of the public policy of New York State. While it is most unfortunate that plaintiff was injured, the courts of this State cannot be called upon to offer him monetary solace for his self-created plight. In the final analysis the Barkers are asking the courts to allow them to recover money damages from plaintiff's "partners in crime". Our response is that because plaintiff's behavior transgressed fundamental concepts of lawful conduct and was unmistakably harmful to the public welfare and safety he cannot be heard to complain in the courts of our State.

The doctrine enunciated in *Riggs* (115 NY 506, *supra*), namely, that no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime, is alive and well in this State despite the enactment of New York's comparative fault statute, and that doctrine is applicable to the case at bar. Thus, we close the doors of the courts of this State to the Barkers in their dispute with plaintiff's alleged coconspirators and their parents.

The order appealed from should be affirmed.

MOLLEN, P. J., RUBIN and BOYERS, JJ., concur.

Order of the Supreme Court, Kings County, dated September 8, 1981, affirmed, without costs or disbursements.