148 F.3d 197
 77 Fair Empl.Prac.Cas. (BNA) 182,
74 Empl. Prac. Dec. P 45,537
Irene HALLIGAN, as Executrix of the Estate of Theodore H.
Halligan, Petitioner-Appellant,
v.
PIPER JAFFRAY, INC., and Marvin Geisness, Respondents-Appellees.
 Docket Nos. 97-7801, 97-7839.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 9, 1998.
Decided July 9, 1998.
 
 Kathleen O'Connell, New York, NY (Murphy & O'Connell, of Counsel), for Petitioner-Appellant.
 Jill L. Rosenberg, New York, NY (Orrick, Herrington & Sutcliffe LLP, Robert C. Whitman, of Counsel), for Respondents-Appellees.
 Fredda L. Plesser, Vice President & Associate General Counsel, Securities Industry Association, New York, NY, for Respondents-Appellees as Amicus Curiae.
 C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Robert J. Gregory, Attorney, Equal Employment Opportunity Commission, Washington, DC, as Amicus Curiae.
 Before: FEINBERG and KEARSE, Circuit Judges, and PARKER*, District Judge.
 FEINBERG, Circuit Judge:
 
 
 1
 Irene Halligan (Mrs. Halligan), as executrix for the Estate of Theodore Halligan (Halligan), appeals from orders dated April 14, June 10 and June 16, 1997 of the United States District Court for the Southern District of New York, Kimba M. Wood, J. The orders of April 14 and June 10 respectively refused to vacate and then confirmed an arbitration award in favor of defendants Piper Jaffray, Inc. (Piper) and Marvin Geisness, Halligan's sales partner, on Halligan's claim, among others, that defendants had terminated his employment in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. The order of June 16, 1997, dismissed as barred by res judicata Mrs. Halligan's federal complaint based on the same underlying facts as the ADEA claim in arbitration.
 
 
 2
 Mrs. Halligan argues, among other things, that the award reflected "manifest disregard" of the law. We agree, and accordingly reverse the orders of the district court.
 
 I. Background
 
 3
 Halligan was hired by Piper in 1973 as a salesman of equity investments to financial institutions. As a condition of employment, Halligan was required by the industry self-regulatory organization, the National Association of Securities Dealers (NASD), to sign a standard form (U-4) containing an agreement to arbitrate any future disputes.[1] In 1988, Tad Piper succeeded his father as CEO of Piper. Mrs. Halligan contends that thereafter Halligan was forced from his job in December 1992 by Tad Piper and Halligan's supervisor, Bruce Huber, because of his age and despite his continuing high performance.
 
 
 4
 In October 1993, Halligan submitted his ADEA claim, along with other claims, to arbitration before a panel of NASD arbitrators. Before he could complete his own re-direct testimony, however, his health deteriorated and in early 1995 the arbitrators were advised that Halligan was unable to testify further. By stipulation, the arbitrators struck his re-direct testimony from the record and continued the proceeding. Halligan's direct testimony had been subject to cross-examination and was not stricken. After his death, Mrs. Halligan continued the arbitration.
 
 
 5
 During the arbitration hearings, Halligan presented the arbitrators with very strong evidence of age-based discrimination. Piper for its part has conceded throughout that Halligan was "basically qualified." Piper principally contended that Halligan had chosen to retire; it also argued that performance and health issues justified its conduct.
 
 
 6
 Before leaving Piper in December 1992, Halligan was making nearly $500,000 per year. He ranked fifth out of 25 institutional salesmen. He was ranked first from 1987 through 1991, and had consistently been among Piper's top salesmen. He testified as to repeated discriminatory statements by Tad Piper, Huber, and Halligan's younger partner Geisness. For example, Halligan testified that at a meeting on August 27, 1992, Tad Piper told him "you're too old. Our clients are young and they want young salesmen," and Huber told him "we want you out of here quickly." Tad Piper and Huber denied making such remarks. Halligan also testified that during a telephone conversation on September 10, 1992, Huber told him that "we want you out of Piper Jaffray by the end of the year," and that "if you don't leave, we will fire you." Halligan testified that he then asked if he could stay for the remainder of the year, and that Huber agreed. Huber testified that during the conversation, Halligan asked him what he should do. He testified that he advised Halligan to resign, and that Halligan agreed "then that's what it will be." Huber admitted that Halligan had never requested his advice before. There were no witnesses to this conversation.
 
 
 7
 Halligan's evidence also included his notes of this and other conversations, a witness who testified that he had seen Halligan recording notes, and several witnesses who heard Halligan say he was being "fired." In addition, Halligan called many witnesses who testified that Piper personnel had expressed their intention to oust Halligan on account of his age. John Dockendorff, a former client and later competitor, testified that in 1989 (the year after Tad Piper became CEO) Huber attempted to recruit him (in Dockendorff's words) to "learn as much as I could about [Halligan's] accounts," because Halligan "would get put out to pasture because he was getting old." All Piper personnel denied having made such statements, although their testimony was occasionally inconsistent or ambiguous. Halligan presented testimonials from current and former clients and colleagues who testified that Halligan was among the best in his field. Halligan refused to provide Piper with a letter of resignation. He also refused an offer of a retirement party and refused to write a letter to his clients saying he was retiring. On November 23, 1992, Halligan's lawyer sent a letter threatening suit if Halligan was terminated. In addition, Halligan testified that he approached Huber in November and asked him if he could keep his job. Huber replied that plans had already been made to close the New York office. Apparently, those plans consisted simply of termination notices to two support staff. Halligan's accounts were thereafter assigned to two younger men. Halligan testified that he unsuccessfully looked for a new job after leaving Piper.
 
 
 8
 Piper principally argued that it gave Halligan the options of retiring, agreeing to a new percentage split with Geisness or being assigned a new group of accounts, and that Halligan agreed to retire in the phone conversation on September 10, 1992. Piper also contended its conduct was justified by concerns over Halligan's performance and health. Halligan had surgery for oral cancer twice (in 1990 and 1991), but returned to work each time after approximately two weeks. Halligan conceded that the surgeries had caused slight speech impairment, but offered various witnesses who testified that Halligan was always able to perform his job. Piper discounted Halligan's objective evidence of performance, arguing that Halligan's accounts had more inherent potential and that the rankings failed to reflect the contributions that other employees had made to Halligan's success. In addition, Huber testified that he thought Halligan needed to develop accounts more effectively (although Huber was unable to identify specific accounts) and use the firm's research and other resources more efficiently. Piper submitted various memoranda related to these concerns, and offered testimony by various witnesses who, with the exception of one employee who had recently retired, were all Piper officers or major shareholders. Piper discounted the testimonials in favor of Halligan, arguing that it was not his clients and former colleagues whose expectations Halligan had to satisfy.
 
 
 9
 Huber was the only witness testifying that in the September 10th telephone conversation Halligan accepted the "option" of retirement, and Huber was contradicted as to key elements of his testimony by other Piper witnesses. For example, Huber testified that Geisness was not informed of the August 27 meeting before it took place, but both Tad Piper and Geisness testified to the contrary. Geisness testified that when he discussed this meeting with Huber, he asked Huber to keep the New York office open.
 
 
 10
 In March 1996, after extensive hearings, the arbitrators rendered a written award setting forth the claims and defenses of each party, and denying any relief to the Halligans. The award did not contain any explanation or rationale for the result.
 
 
 11
 In June 1996, Mrs. Halligan petitioned the district court to vacate the award under § 10(a) of the Federal Arbitration Act (FAA), 9 U.S.C. § 10(a). She argued, among other things, that given the very strong evidence of discrimination and the clear description of the applicable law presented to the arbitrators, the award reflected manifest disregard of the law.
 
 
 12
 Piper agreed that the law governing the claim was generally not disputed by the parties, but argued in response that it was not the function of the court to review the merits of the decision and that the arbitrators' award was supported by the evidence Piper presented. Piper cross-petitioned the district court to confirm the award.
 
 
 13
 The district judge refused to vacate the award. She stated in the order of April 14, 1997 that
 
 
 14
 [h]ere, the determination of what constitutes "direct evidence" [of discrimination] ... is a difficult one to make. In addition, the record ... does not indicate the Panel's awareness, prior to its determinations, of the standards for burdens of proof.... [T]he Panel was faced with the task of evaluating conflicting witness testimony, and where it did not issue a written opinion, I cannot conclude that the panel did in fact disregard the parties' burdens of proof.... [C]rediting one witness over another does not constitute manifest disregard of the law [and] this Court's role is not to second-guess the fact-finding done by the Panel. Because there is factual as well as legal support for the Panel's ultimate conclusion, I determine that the Panel did not manifestly disregard the law .... (internal citations and footnote omitted).
 
 
 15
 The judge granted Piper's cross-petition to confirm the award in her order of June 10, 1997.
 
 
 16
 In addition to petitioning to vacate the arbitration award, in October 1996 Mrs. Halligan had filed a complaint in the district court based upon the same underlying facts and raising the ADEA claim. Piper moved to dismiss this complaint on grounds of res judicata, and the district court granted the motion in its order dated June 16, 1997.
 
 II. Analysis
 
 17
 Mrs. Halligan argues in this court, among other things, that the arbitrators' award reflected manifest disregard of the law. Piper argues in response, among other things, that it is not the function of this court to reassess the evidence or make judgments about witness credibility and that the district court was able to adequately review the award--even in the absence of a written explanation--by inferring from the record grounds that support the arbitrators' award. We have also received amicus briefs from the Equal Employment Opportunity Commission (EEOC) and the Securities Industry Association (SIA).
 
 A. Arbitrability of ADEA Claims
 
 18
 This appeal arises in a context that has become increasingly important in the federal courts. The use of arbitration as a device to resolve disputes has received strong judicial support in the last few decades, both in labor management disputes and also in disputes involving ordinary commercial contracts. See e.g., AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (labor dispute); Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (commercial dispute). It has been made clear by the Supreme Court, this court and other courts that the ancient judicial hostility to arbitration is a thing of the past. See e.g., Moses H. Cone Memorial Hosp., 460 U.S. at 24, 103 S.Ct. 927; Leadertex v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 24-25 (2d Cir.1995); Finegold, Alexander & Assocs., Inc. v. Setty & Assocs., Ltd., 81 F.3d 206, 207-08 (D.C.Cir.1996); Jose A. Cabranes, Arbitration and U.S. Courts--Balancing Their Strengths, A.D.R. Currents, Fall 1997, at 1. However, one aspect of the increased use of arbitration has recently engendered greater scrutiny and controversy--the use of mandatory pre-dispute arbitration agreements to resolve statutory claims of employment discrimination. Such agreements require an individual, as a condition of employment, to agree in advance to arbitration of future claims alleging violation of a statute prohibiting discrimination in employment. The arbitration award here arose out of such an agreement.[2]
 
 
 19
 In Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court found for the first time that an employee could be held to his pre-dispute agreement to arbitrate his claim under the ADEA, the same statute upon which the Halligans rely. The Court relied on a line of cases, commencing with Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), that held enforceable pre-dispute arbitration agreements as applied to claims under various federal statutes, including the securities acts and RICO. In Mitsubishi, the Court had enforced an agreement between two corporations to arbitrate claims under the federal antitrust laws, on the premise that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Id., 473 U.S. at 628, 105 S.Ct. 3346. In Gilmer, which quoted this language, the Court held that an employee, who had been required to sign a form containing an agreement to arbitrate as a condition of employment, had not shown that Congress intended to preclude the waiver of a judicial forum for ADEA claims. 500 U.S. at 26, 111 S.Ct. 1647. Again quoting from Mitsubishi, the Court stated that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Id. at 28, 111 S.Ct. 1647.
 
 
 20
 The Court also noted in Gilmer the contention "that judicial review of arbitration decisions is too limited" to adequately protect statutory rights. Id. at 32 n. 4, 111 S.Ct. 1647. Quoting from Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 232, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Court rejected that argument, stating that "although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute." Gilmer, 500 U.S. at 32 n. 4, 111 S.Ct. 1647. The employee in Gilmer also generally challenged the procedures usually employed in arbitration. The Court stated that these "claimed procedural inadequacies" are "best left for resolution in specific cases." Id. at 33, 111 S.Ct. 1647.
 
 B. Standard of Review of Award
 
 21
 The parties agree that review of arbitration awards is generally governed by the FAA. The relevant statutory language is reproduced in the margin.[3] In addition, relying on an observation by the Supreme Court in Wilko v. Swan, 346 U.S. 427, 436-37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), overruled on other grounds in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), this court has also recognized that an arbitration award may be vacated if it is in "manifest disregard of the law." See e.g., Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd., 888 F.2d 260, 265 (2d Cir.1989); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir.1986). We have also pointed out, however, that the reach of the doctrine is "severely limited." Government of India v. Cargill, Inc., 867 F.2d 130, 133 (2d Cir.1989). Indeed, we have cautioned that manifest disregard "clearly means more than error or misunderstanding with respect to the law." Bobker, 808 F.2d at 933. We have further noted that to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. Dirussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998).[4]
 
 
 22
 This case also arises in the context of other developments. In the aftermath of Gilmer, as we have already noted, mandatory binding arbitration of employment discrimination disputes as a condition of employment has caused increased controversy. Attention has focused on, among other things, whether additional procedural requirements are necessary to ensure that employees will be able, in the words of Gilmer, to "effectively ... vindicate" their statutory rights in arbitration. 500 U.S. at 28, 111 S.Ct. 1647. See e.g., Commission on the Future of Worker-Management Relations, Report and Recommendations (1994) (Dunlop Report); EEOC Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment, No. 915.002 (July 10, 1997); Samuel Estreicher, Predispute Agreements to Arbitrate Statutory Employment Claims, 72 N.Y.U. L.Rev. 1344, 1352-59 (1997). The major independent arbitration agencies have formulated due process standards for the adjudication of these disputes. See e.g., National Academy of Arbitrators, Guidelines on Arbitration of Statutory Claims Under Employer-Promulgated Systems (Statement adopted May 21, 1997); American Arbitration Association, National Rules for the Resolution of Employment Disputes (1996, as amended 1997); JAMS/ENDISPUTE, Six Principles of Neutrality and Fairness for Employment Dispute Resolution Practice (1995).
 
 
 23
 Industry self-regulatory organizations (SRO's) like the NASD have been singled out for criticism because, among other reasons, the role they play in determining the pool of available arbitrators and selecting the arbitrators who will hear a particular discrimination claim against a member firm of the SRO calls into question the impartiality of the arbitrators selected. See e.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 995 F.Supp. 190, 206-12 (D.Mass.1998) (appeal pending) (discussing possibility of institutional bias due to industry influence over arbitration before SRO's and, in particular, under the rules of the New York Stock Exchange); George Nicolau, Gilmer v. Interstate/Johnson Lane Corp.: Its Ramifications and Implications for Employees, Employers and Practitioners, 1 U. Pa. J. Lab. & Emp. L. 175, 183 (forthcoming 1998).
 
 
 24
 Mrs. Halligan argues that the NASD has undue influence here. Under the NASD's Code of Arbitration Procedure, a pool of arbitrators "from within and without the securities industry" is selected by a National Arbitration Committee, a body appointed annually by the Board of Governors "of such size and composition, including representation from the public at large, as [the Board] shall deem appropriate and in the public interest." NASD Code of Arbitration Procedure § 2. The composition of particular panels is then determined by a Director of Arbitration who is also appointed by the Board of Governors, and the Director has discretion to allow the Executive Committee of the National Arbitration Committee to appoint the panel for a case directly. Id. at §§ 3-4. Each party is allowed a single peremptory challenge as of right. Id. at § 22.
 
 
 25
 In response to criticism, the NASD has recently filed a proposed rule change with the Securities and Exchange Commission under which its member organizations would not be required to condition employment on an employee's agreement to arbitrate these disputes. Notice of Filing of Proposed Change by the NASD Relating to the Arbitration of Employment Discrimination Claims, 62 F.R. 66164 (December 17, 1997). The filing promises further unspecified rule changes to enhance the fairness of the procedures applied by the NASD in this context. There have also been bills introduced in Congress that would prevent pre-dispute waiver of a judicial forum. See the Civil Rights Procedures Protection Act of 1997, S. 63, H.R. 983, 105th Cong. (1997).
 
 
 26
 In addition, the federal courts have shown growing concern over the problem. For example, the D.C. Circuit has recently emphasized the necessity of adequate review in enforcing a mandatory, pre-dispute agreement to arbitrate Title VII discrimination claims. Cole v. Burns Int'l Sec. Serv., 105 F.3d 1465 (D.C.Cir.1997). Similarly, in Prudential Ins. Co. of Am. v. Lai, 42 F.3d 1299 (9th Cir.1994), the Ninth Circuit held that waivers of a judicial forum for statutory employment discrimination claims must be "knowing and voluntary" and refused to enforce an agreement to arbitrate that did not meet that standard. See also Chisolm v. Kidder, Peabody Asset Management, 966 F.Supp. 218, 225-26 (S.D.N.Y.1997) (appeal pending) (thorough review of relevant authorities); Rosenberg, 995 F.Supp. 190 (holding employee could not be compelled to arbitrate her claim given questions as to the voluntary nature of her agreement to arbitrate and procedural deficiencies in the proposed arbitral forum). Given our disposition of this appeal on the merits of the award issued in this case, with one exception discussed below we do not address Mrs. Halligan's generalized challenge to arbitrations conducted under the aegis of the NASD.
 
 C. Application of Standard of Review
 
 27
 We turn now to review of the district court's decision in this case. Mrs. Halligan argued in the district court and repeats to us that the arbitration award reflected manifest disregard of the law. Mrs. Halligan makes a strong case for that proposition. Quite simply, Halligan presented overwhelming evidence that Piper's conduct after Tad Piper became CEO was motivated by age discrimination. Halligan testified to repeated discriminatory statements, and offered contemporaneous notes supporting his version of events, which were in turn backed by the testimony of a witness who saw him making notes. Halligan also presented the testimony of numerous other witnesses who testified that Piper personnel admitted that the company wanted Halligan out. Halligan presented powerful evidence of his performance, in the form of quantitative sales rankings and relevant witness testimony. Notwithstanding Piper's testimony as to Halligan's performance and health, Piper conceded before the arbitrators--and continues to do so--that Halligan's continuing performance was not so unsatisfactory as to justify discharge. Indeed, its principal argument has been that Halligan retired voluntarily. Halligan also made a very strong showing that he did not choose the "option" of quitting but was fired. The strength of Halligan's showing of discriminatory motive is most probative of whether Piper took discriminatory action, i.e., fired him. In addition, the circumstantial evidence surrounding his departure, e.g., his statements to various witnesses about his being "fired," his refusal to write to his clients announcing his "resignation," his retention of counsel, is consistent only with a finding that Halligan was pushed out of his job.
 
 
 28
 Moreover, this is not a case like Dirussa where we refused to find "manifest disregard" because DiRussa had not sufficiently brought the governing law to the attention of the arbitrators. There is no such problem here. The record indicates that counsel for both parties generally agreed on the applicable law (and still do on appeal), and explained it to the arbitrators. It is true that the district court stated that the record "does not indicate the Panel's awareness, prior to its determinations, of the standards for burdens of proof." If this observation meant that counsel did not explain the law sufficiently to the arbitrators, it is not correct. Perhaps the district court meant that the arbitrators did not state that they were ignoring the relevant standards for burdens of proof. That is true, but we doubt whether even under a strict construction of the meaning of manifest disregard, it is necessary for arbitrators to state that they are deliberately ignoring the law. See DeGaetano v. Smith Barney, Inc., 983 F.Supp. 459, 463 (S.D.N.Y.1997).
 
 
 29
 In view of the strong evidence that Halligan was fired because of his age and the agreement of the parties that the arbitrators were correctly advised of the applicable legal principles, we are inclined to hold that they ignored the law or the evidence or both. Moreover, the arbitrators did not explain their award.[5] It is true that we have stated repeatedly that arbitrators have no obligation to do so. E.g., Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1214 (2d Cir.1972); Koch Oil, S.A. v. Transocean Gulf Oil Co., 751 F.2d 551, 554 (2d Cir.1985); Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.), 579 F.2d 691, 704 (2d Cir.1978). But in Gilmer, when the Supreme Court ruled that an employee could be forced to assert an ADEA claim in an arbitral forum, the Court did so on the assumptions that the claimant would not forgo the substantive rights afforded by the statute, that the arbitration agreement simply changed the forum for enforcement of those rights and that a claimant could effectively vindicate his or her statutory rights in the arbitration. 500 U.S. at 26, 28, 111 S.Ct. 1647. This case puts those assumptions to the test. The Court also stated in Gilmer that "claimed procedural inadequacies" in arbitration "are best left for resolution in specific cases," 500 U.S. at 33, 111 S.Ct. 1647. At least in the circumstances here, we believe that when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account. Having done so, we are left with the firm belief that the arbitrators here manifestly disregarded the law or the evidence or both.
 
 
 30
 Piper argues that the arbitration panel resolved the case in accordance with substantive ADEA law; for example, it credited Piper's witnesses rather than Halligan's. Had the arbitrators offered that explanation of the award, on this record it would have been extremely hard to accept--but they did not do even that. There is some authority permitting discretionary remand of a case to the arbitrators for a written explanation of their award. Siegel v. Titan Indus. Corp., 779 F.2d 891, 894 (2d Cir.1985)(per curiam). But in view of the entire record here, we see no persuasive reason for doing so.
 
 
 31
 We want to make clear that we are not holding that arbitrators should write opinions in every case or even in most cases. We merely observe that where a reviewing court is inclined to find that arbitrators manifestly disregarded the law or the evidence and that an explanation, if given, would have strained credulity, the absence of explanation may reinforce the reviewing court's confidence that the arbitrators engaged in manifest disregard.
 
 
 32
 For the reasons stated above, we reverse the district court's orders of April 14, 1997 and June 10, 1997 respectively refusing to vacate and then confirming the award. We also reverse the order of June 16, 1997 dismissing the complaint filed in the district court by Mrs. Halligan because there is no enforceable award to bar the suit on res judicata principles. We remand to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 Hon. Barrington D. Parker, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Halligan was required to agree "to arbitrate any dispute ... that may arise between me and my firm ... required to be arbitrated under the rules, constitutions, or by-laws of [the NASD.]" When Halligan signed his U-4, section 1 of the NASD's Code of Arbitration Procedure allowed for the submission of "any dispute .... arising out of or in connection with the business of any member ... between or among members and public customers, or others ...." Section 8 required submission of "[a]ny dispute ... eligible for submission ... between ... members and/or associated persons ... arising in connection with the business of such member(s)...."
 
 
 [2]
 Piper contends that Halligan voluntarily submitted his claim to arbitration. Halligan had, however, been required to agree to an extremely broad arbitration clause, see footnote 1, which established a presumption of arbitrability that could only be overcome if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir.1987) (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). In light of our current caselaw, Halligan was correct in considering himself bound to arbitrate
 
 
 [3]
 The FAA provides that an award may be vacated where
 (1) ... the award was procured by corruption, fraud or undue means[,]
 (2) ... there was evident partiality or corruption in the arbitrators ... [,]
 (3) ... the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced [; or]
 (4) ... the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the ... matter submitted was not made.
 9 U.S.C. § 10(a).
 
 
 [4]
 See generally, Michael P. O'Mullan, Note, Seeking Consistency in Judicial Review of Securities Arbitration: An Analysis of the Manifest Disregard of the Law Standard, 64 Fordham L.Rev. 1121 (1995)
 
 
 [5]
 A leading expert in the field has asserted that NASD arbitrators are expressly advised that they are not required to follow the law and need not give reasons for their determination. Nicolau, supra, p. 17, at 183