THE GMS GROUP, LLC, and
Joseph Costa, Plaintiffs,

v.

Nathan BENDERSON, Defendant.

No. 01–CV–347C(SR).

United States District Court,
W.D. New York.

Nov. 29, 2001.

Fulbright & Jaworski, L.L.P. (Lionel G. Hest, Esq., of Counsel), New York, New York, for Plaintiffs.

Mattar & D'Agostino, LLP (Krista Gottlieb, Esq., of Counsel), Buffalo, New York, for Defendant.

CURTIN, District Judge.

Plaintiffs bring this action pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, seeking judicial review of an arbitration award rendered by the National Association of Securities Dealers ("NASD") Dispute Resolution, Inc., on April 6, 2001, in the claim titled *Benderson v. The GMS Group, LLC and Joseph Costa*, NASD Arbitration No. 98–02618. Plaintiffs have moved for an order vacating the award pursuant to 9 U.S.C. § 10. Oral argument of the motion was heard by the court on October 26, 2001. For the following reasons, plaintiffs' motion is denied.

## BACKGROUND

The factual and procedural background of the underlying dispute is set forth at length in the pleadings and supporting affidavit of Lionel G. Hest, plaintiffs' arbitration counsel (Item 3), and the responding affidavit of Patrick J. Finegan, Jr., defendant's arbitration counsel (Item 14). Plaintiff GMS Group, LLC, is a securities dealer/broker registered with the United States Securities and Exchange Commis-

sion ("SEC"), and is a member of NASD. GMS is a limited liability corporation with its principal place of business in Livingston, New Jersey. Plaintiff Joseph Costa is an employee and registered representative of GMS. Defendant Nathan Benderson is a resident of Orchard Park, New York, and is owner, president, and chief executive officer of the Benderson Development Company.

According to Mr. Benderson's Statement of Claim, filed with the NASD on June 6, 1998, Benderson had been doing a "fixed income" investment business with GMS and Costa for several years prior to December 1996, when he discussed with Costa the availability of investment alternatives "to perhaps extract something" from the generally reported advances in the stock markets (Item 3, Ex. B, p. 4). Costa suggested index options, which involve contracts (referred to as "puts" or "calls") to buy or sell a specified number of shares or commodities within a set time period and at a predetermined price, based on the rise and fall of the various securities indices. Between December 1996 and May 1997, Benderson (through GMS and Costa) executed several index option transactions, which resulted in a net loss of $1,513,340.00 (*id.*, pp. 5–11). Benderson sought restitution of this amount, as well as loss of opportunity costs, punitive damages, and attorneys' fees, based on the following causes of action:

1. Common law fraud, based on alleged violations of SEC, NASD, and New York Stock Exchange ("NYSE") rules prohibiting fraudulent practices in securities transactions.

2. Common law fraud, based on alleged violations of NASD and NYSE rules requiring a broker to have reasonable grounds for recommending securities transactions suitable for the customer.

3. Common law fraud, based on alleged misrepresentations by Costa as to the soundness of the investments.

4. Breach of contract, based on Costa's alleged failure to adhere to the underlying brokerage agreement to make investment recommendations for the customer's benefit.

5. Breach of fiduciary duty, based on Costa's alleged failure to act in accordance with his solicited professional obligation of financial responsibility.

6. Negligence, based on the foreseeable harm proximately caused by Costa's alleged failure to meet the standards set forth in the SEC, NASD and NYSE suitability and supervision rules.

7. Securities law violations, based on several federal and state statutory and regulatory provisions.

(*Id.*, pp. 30–41.)

On December 1, 1998, GMS and Costa filed their answer to the claim, denying all allegations of wrongdoing and setting forth several affirmative defenses (*see* Item 3, Ex. C). GMS and Costa contended that Benderson himself initiated the index option transactions at issue by contacting Costa to inquire about an investment device he had heard about whereby he could "place a bet" that the stock market would decline in value. According to the answer, Benderson directed Costa to execute the transactions despite Costa's several unsuccessful attempts to dissuade him and repeated oral and written warnings about the risks of index options trading (*see id.*, p. 2).

A hearing was commenced on February 24, 2000, before a panel of three NASD arbitrators. The hearing concluded on March 1, 2001, after a total of eleven days of testimony and argument.[1] At the conclusion of the hearing, counsel for GMS and Costa requested a written opinion explaining the panel's rationale for its disposition of each claim. On April 6, 2001, the panel issued its award, finding as follows:

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. [GMS and Costa] be and hereby are jointly and severally liable for and shall pay to [Benderson] the sum of $150,000.00 as compensatory damages.

2. [Benderson]'s request for punitive damages is hereby denied.

3. All other requests for relief are hereby denied.

(Item 3, Ex. A, p. 2.) The award also contained a brief case summary and other basic information about the claim, but it did not contain a written explanation of the arbitrators' rationale.

On May 11, 2001, GMS and Costa filed this action for judicial review under the Federal Arbitration Act, accompanied by an application for an order to show cause why the arbitration award should not be vacated and remanded to the NASD for further findings. Benderson has responded to the application. Upon consideration of the matters set forth in the pleadings and at oral argument, I find that plaintiffs have failed to meet the heavy burden of proof necessary to justify vacating the arbitration award, and the case must therefore be dismissed.

## DISCUSSION

■ Federal court review of an arbitration award is governed by Section 10(a) of

---

1. Plaintiffs have submitted to the court, as exhibits in support of their application for judicial review of the arbitration award, twenty-five hearing tapes, a prepared transcript of the hearing comprising over two thousand pages, and both parties' hearing exhibits.

the Federal Arbitration Act, which provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration-

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10(a).

In addition to these statutory grounds, the Second Circuit has also recognized that an arbitration award may be vacated if it is in "manifest disregard of the law." *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 201–02 (2d Cir.1998) (citing cases), *cert. denied*, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999). Application of this judicially created ground, which was introduced by the Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), is "severely limited." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d

930, 933 (2d Cir.1986). In order to justify modifying or vacating an award on the ground of manifest disregard, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *Dirussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir.1997), *cert. denied*, 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998). "To adopt a less strict standard of judicial review would be to undermine [the] well established deference to arbitration as a favored method of settling disputes when agreed to by the parties." *Bobker*, 808 F.2d at 933.

The burden of proving that the arbitrators acted in manifest disregard of the law rests with the party making the application. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997). The burden is "an extremely high one, especially where, as here, numerous legal theories are presented to a panel, and the award is rendered without opinion." *Wall Street Associates, L.P. v. Becker Paribas, Inc.*, 818 F.Supp. 679, 686 (S.D.N.Y.1993), *aff'd*, 27 F.3d 845 (2d Cir.1994).

The federal courts, including the Second Circuit, have repeatedly reaffirmed the principle that arbitrators are not required to provide written rationale for their awards. *See, e.g., Wall Street Associates*, 27 F.3d at 849. Indeed, "courts generally will not look beyond the lump sum award in an attempt to analyze the reasoning processes of the arbitrators." *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 121 (2d Cir.1991) (quotation and citation omitted).

When the arbitrators have not provided a specific explanation or rationale, the reviewing court "must confirm the arbitrators' decision 'if a ground for

the arbitrator[s'] decision can be inferred from the facts of the case.' This is so even if the ground for their decision is based on an error of fact or an error of law." *Standard Microsystems*, 103 F.3d at 12–13 (quoting *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1216 (2d Cir.1972)). If the record provides "even a barely colorable justification for the outcome reached" by the arbitrators, the court must confirm the award. *Id.* at 13. In conducting its review, "it is not the court's function to weigh the evidence anew or to make findings of fact. Rather, the court's role is limited to reviewing the evidence in the case to determine whether a basis exists for the outcome reached." *Ahing v. Lehman Brothers, Inc.*, 2000 WL 460443, at *9 (S.D.N.Y. April 18, 2000) (citing *Campbell v. Cantor Fitzgerald & Co., Inc.*, 1998 WL 740927, at *2 (S.D.N.Y. October 21, 1998)).

In *Halligan v. Piper Jaffray, Inc.*, the Second Circuit addressed the scope of district court review of an NASD panel's arbitration award in favor of a securities brokerage firm on an employee's age discrimination claim. The employee claimed in his federal court complaint that the award, issued without any written explanation or rationale, reflected the arbitration panel's manifest disregard of employment discrimination law. The district court disagreed, finding factual and legal support for the panel's denial of relief, but the Second Circuit reversed. The court first examined the "increasingly important" issue of the arbitrability of age discrimination claims under a mandatory arbitration clause in an employment agreement. 148 F.3d at 200. Next, the court discussed the standards for "manifest disregard" review in the context of employment discrimination arbitration before "[i]ndustry self-regulatory organizations (SRO's) like the NASD ...." *Id.* at 202. Against this background, the court then examined the arbitration record to find "overwhelming evidence" in support of the plaintiff's dis-

crimination claim, as well as sufficient indication that the arbitrators were correctly advised of the applicable legal principles. *Id.* at 203–04. The court stated as follows:

In view of the strong evidence that [the plaintiff] was fired because of his age and the agreement of the parties that the arbitrators were correctly advised of the applicable legal principles, we are inclined to hold that they ignored the law or the evidence or both. Moreover, the arbitrators did not explain their award. It is true that we have stated repeatedly that arbitrators have no obligation to do so. But, ... [a]t least in the circumstances here, we believe that when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account. Having done so, we are left with the firm belief that the arbitrators here manifestly disregarded the law or the evidence or both.

*Id.* at 204 (citations and footnotes omitted).

Plaintiffs place heavy reliance on the Second Circuit's holding in *Halligan*, arguing that the "overwhelming" evidence presented to the arbitrators clearly establishes that the award was rendered in manifest disregard of NASD Rules regarding the suitability of recommended securities transactions. Specifically, plaintiffs cite NASD Rule 2860(19), which provides:

**Suitability**

(A) No member or person associated with a member shall recommend to any customer any transaction for the purchase or sale (writing) of an option contract unless such member or person associated therewith has reasonable grounds to believe upon the basis of information furnished by such customer after reasonable inquiry by the member or person associated therewith concerning the customer's investment objec-

tives, financial situation and needs, and any other information known by such member or associated person, that the recommended transaction is not unsuitable for such customer.

(B) No member or person associated with a member shall recommend to a customer an opening transaction in any option contract unless the person making the recommendation has a reasonable basis for believing, at the time of making the recommendation, that the customer has such knowledge and experience in financial matters that he may reasonably be expected to be capable of evaluating the risks of the recommended transaction, and financially able to bear the risks of the recommended position in the option contract.

(Item 1, ¶ 17.) Plaintiffs also cite NASD Rule 2310, which provides:

**Recommendations to Customers (Suitability)**

(a) In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b) Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1) the customer's financial status;

(2) the customer's tax status;

(3) the customer's investment objectives;

(4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

(*Id.*)

Plaintiffs argue that, by their express terms, these rules apply only when there is a recommendation made by the broker. According to plaintiffs, the undisputed evidence presented at the arbitration hearing clearly shows that Costa did not "recommend" to Benderson that he trade in index options. Instead, it was Benderson who approached Costa and initiated the discussion about betting on the market. Benderson asked how that could be accomplished, and Costa responded "OEX" (index options). Plaintiffs contend that Costa did not encourage or recommend trading in index options. To the contrary, he warned Benderson about the risks involved, told Benderson he had never traded in index options, and asked him if he was sure he really wanted to do that.[2]

---

2. In his affidavit, plaintiffs' counsel provides cites to several excerpts from the unofficial transcript of the arbitration hearing, including the following excerpts from Mr. Benderson's testimony:

Q: We have heard testimony about where this idea of index options came from. But, I want you to tell the panel where did the idea of using index options come from?

A: There came a time that I had stopped buying tax free bonds for myself and I had accumulated some money with Mr. Costa and I felt that the stock market was pretty high and it was going to take a tumble. And, I discussed with Mr. Costa and asked him what is the best way to buy, to get involved, I should say in betting that the market was going to go down.

    *    *    *    *    *    *

Q: And you testified that it was your idea to bet on the market declining?

A: Yes.

Q: Nobody suggested that to you?

A: No, nobody suggested it.

Q: So that's another one of the things you initiated, correct?

Plaintiffs offer the alternative argument that, even if Costa did make a recommendation to purchase index options, the undisputed hearing evidence provides reasonable grounds to believe that the recommendation was within the standards set forth in the NASD suitability rules (*see* Item 3, ¶¶ 28–37). Plaintiffs further contend that the hearing evidence provides no basis for finding "scienter" on the part of Costa or GMS necessary for statutory or common law fraud liability. According to plaintiffs, *Halligan* instructs that in the face of such evidence (or lack thereof), the district court can also take into account the failure of the arbitrators to explain the award as a factor in determining whether the panel "manifestly disregarded the law or the evidence or both." *Halligan,* 148 F.3d at 204.

I agree with plaintiffs' reading of *Halligan.* I do not agree with plaintiffs' contention that, as in *Halligan,* the record in this case provides "overwhelming" or "strong" evidence to support a finding that the arbitrators manifestly disregarded the law or the evidence or both. For example, defendant refers to hearing testimony indicating that, after Benderson's initial inquiry about the possibility of extracting profits from the anticipated decline in the markets generally, the actual information about the appropriate device for doing so came directly from Costa.[3] Defendant also refers to the hearing testimony of Douglas Henderson, a partner in KMPG Financial Services' National Regulatory Practice and former Director of the NASD District Office in New York City (*see* Curriculum Vitae, attached to Gottlieb Aff., Item 14, Ex. D). Mr. Henderson was called by Costa and GMS as an expert witness to provide his opinion as to whether Costa made a recommendation to Bend-

---

A: I initiated that I wanted to try and buy [sic], yes, on the market going down.

  *   *   *   *   *   *

Q: Sir, you testified ... that when you first went to Mr. Costa and said you wanted to bet on the market going down he came back to you and said in so many words are you really sure that you want to do that, do you remember that?

A: He said words to that effect, yes.

(Item 3, ¶¶ 19, 20).

**3.** In her affidavit, defense counsel likewise provides cites to several excerpts from the unofficial transcript of the arbitration hearing, including the following excerpts from Mr. Benderson's testimony:

Q: Did you ever hear of the term before this ... conversation with Mr. Costa, OEX before?

A: Never.

Q: Do you know what OEX stands for? •

A: No, I don't.

Q: Now, ultimately you did transactions in something called OEX, didn't you?

A: Yes.

Q: How did that come about?

A: Well, during my discussion with Mr. Costa I asked him, as I mentioned before, the best way to get involved betting that the market was going to go down. Mr. Costa told me at that time that he had never done this before or handled an account like that before but he had said something that I was sure I would like to get into and I said, yes, and he said, let me check with my office and I will tell you the-you know, suggest to you or tell you the best way to do it.

Q: So, what happened with that conversation, did you do any OEX during that conversation?

A: Not during that conversation. Mr. Costa either called me back that same afternoon or the next day and suggested that I buy, that I-he suggested the way that I should do it.

  *   *   *   *   *   *

... He suggested that I could buy a stock or an option-I don't believe he called on the OEX either at that time. I believe he said I could buy an option to, through the market to go down or I could buy it to go up. But, I was interested in it going down. It was there. I wasn't interested [i]n it going up and his suggestion was for me to buy it the way that I did.

(Item 14, Gottlieb Aff., ¶¶ 28–32 & Ex. E, pp. 1234–36.)

erson. During the course of extensive questioning by the panel members, Mr. Henderson was asked by the Chairman to explain "what constitutes a recommendation." He responded:

I will qualify my answer by saying there isn't a bright definition around this. The NASD and other securities regulators have purposely shied away from a clear definition about recommendation and you go back through the pronouncements by the regulators and you will see that they are very careful not to box in a definition if you will.

It's like insider trading or pornography. The regulators have chosen to take this position. We know it when we see it, but when you look at the pronouncements you will see that the regulators almost always will say that it is a [facts] and circumstances specific definition, so you end up looking at particular case[s] and arriving at what constitutes a recommendation or what may not [constitute] a recommendation . . . .

(Item 14, Gottlieb Aff., Ex. D, pp. 1896–97.)

Further scrutiny of Mr. Henderson's hearing testimony reveals the panel's struggle with the notion that Costa's response to Benderson's question about how to make money by betting on the market's decline, made in the context of a long-standing financial relationship based primarily on Costa's expertise in trading municipal bonds, could *not* be considered a recommendation within the meaning of the NASD suitability rules (*see id.*, pp. 1898–1918). In addition, the undisputed facts borne out by Costa's own hearing testimony show that he had no experience in high-risk index options trading (*see, e.g., id.*, Ex.

G, pp. 560–84). This alone suggests a reasonable basis for the panel to conclude that Costa did not comply with the obligations imposed by the suitability rules, or that he otherwise breached his professional or fiduciary obligations as Benderson's broker. Based on this record, considered in the context of the numerous legal theories presented to the panel, it cannot be said that the arbitrators were aware of but refused to apply clearly applicable legal principles.

Significantly, it is noted that the lump sum of the award was $150,000.00, less than one-tenth of the actual damages claimed. No punitive damages or attorneys' fees were awarded, and the parties were otherwise directed to pay their own arbitrations costs. In light of this result, and considering the facts and circumstances of the dispute as set forth in the materials submitted in connection with the present application, I am not inclined (as the circuit court was in *Halligan* ) to accord any special significance to the absence of a written explanation.[4]

In short, because the record submitted to the court provides, at a minimum, "a barely colorable justification for the outcome reached" by. the arbitrators, *Standard Microsystems,* 103 F.3d at 13, plaintiffs have failed to meet their burden of proving that the arbitrators acted in manifest disregard of the law. The court's function is not to decide whether the evidence and testimony presented at the hearing was credible, or whether the panel should have been persuaded by it. Instead, under the deferential standard of review that applies to the manifest disregard doctrine, the court need only deter-

---

4. It is further noted that *Halligan* was decided in the context of federal court review of a NASD panel's arbitration award on an employment discrimination claim brought under a federal anti-discrimination statute, whereas this case was brought in the context of a NASD panel's determination of a claim based on NASD rules and securities laws more squarely within NASD expertise.

**326**

mine whether any justification for the award can be ascertained from the submissions made to the arbitrators. As demonstrated by the discussion above, justification can easily be found here.

Finally, when questioned at oral argument, the parties advised that they had no further authority to bring to the court's attention.

Accordingly, there is no basis for the relief sought by plaintiffs in the complaint and application for an order vacating the arbitration award.

### CONCLUSION

Based on the foregoing, plaintiffs' application for an order vacating the arbitration award rendered in the claim titled *Benderson v. The GMS Group, LLC and Joseph Costa*, NASD Arbitration No. 98–02618, is denied. There being no basis for the relief sought in the complaint, the case is dismissed. The Clerk of the Court is directed to enter judgment in favor of defendant.

So ordered.