**Bernard MCDANIEL and Maureen McDaniel, Claimants– Petitioners,**

v.

**BEAR STEARNS & CO., INC. and Bear Stearns Securities Corp., Respondents–Respondents.**

No. 01 CIV. 7054(SAS).

United States District Court, S.D. New York.

Jan. 16, 2002.

As Amended Jan. 25, 2002.

Jonathan Kord Lagemann, Lagemann Law Offices, New York City, for Petitioner.

Peter L. Zimroth, Michael D. Schissel, David A. Weintraub, Arnold & Porter, New York City, for Respondents.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Bear Stearns & Co., Inc. ("Bear Stearns"), a New York investment bank, offers clearing services for other broker-dealers through its subsidiary Bear Stearns Securities Corporation ("BSSC"). BSSC served as the clearing firm for broker-dealer A.R. Baron ("Baron") at a time when Baron engaged in criminal and fraudulent conduct. Petitioners Bernard and Maureen McDaniel ("Claimants") were Baron customers during this time.

On July 31, 2001, an arbitration panel (the "Panel") found Bear Stearns and BSCC (collectively "Bear") jointly and severally liable to Claimants for breach of contract and for aiding and abetting Baron's fraud. The arbitrators issued a thirty-six page arbitration award (the "Award") which offered detailed findings of fact and explained their conclusions of law. In this motion to vacate that Award, Bear has attacked the Panel's decision on numerous grounds. As discussed below, none of the issues raised by Bear show that the Panel exceeded its power or manifestly disregarded the law or evidence so as to require vacating the Award.

The Supreme Court has more than once told lower courts that the Federal Arbitration Act ("FAA") establishes a strong federal policy favoring arbitration. *See e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). This policy reflects a desire to enforce arbitration agreements into which parties have entered as well as to encourage swift and efficient dispute resolution. *See Dean*

*Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1987); *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997). "Undue judicial intervention would inevitably judicialize the arbitration process, thus defeating the objective of providing an alternative to judicial dispute resolution." *Tempo Shain Corp. v. Bertek Inc.,* 120 F.3d 16, 19 (2d Cir.1997) (quotation marks omitted). For these reasons, arbitration decisions are accorded "great deference." *Id.*

An investment bank such as Bear that has repeatedly agreed to arbitration—and, in fact, drafted the contract requiring these parties to arbitrate—was well-aware of the binding nature of arbitration and the deference that courts must afford to arbitration awards. Bear knows that a motion to vacate is not an appeal; federal courts are not supposed to "superintend arbitration proceedings." *Id.* (quotation marks omitted). It also knows that district courts do not hear appeals from decisions of arbitration panels which, by definition, are final and binding.

Bear has payed lip service to the vacatur standards of "exceed[ing] its power" and "manifest disregard" in asking this Court, *sub silentio,* to substitute its judgment for that of the Panel. If I had that authority, I might indeed have decided the case differently.[1] However, the Court's review of an arbitration award is rigidly narrow. Given these constraints, Bear's motion undermines the concept of swift and efficient dispute resolution.

For the reasons stated below, Bear's motion to vacate the Award is denied and Claimants' cross-motion to confirm the Award is granted.

---

1. For cases dismissing claims against a clearing firm for aiding and abetting an introducing broker's fraud, see *infra* Part II.A.1.a & c. For cases dismissing claims against a clearing firm for failing to disclose certain information to the introductory firm's customers, see *infra* Part II.B.2.

## I. BACKGROUND

### A. The Role of Clearing Firms and the Applicable Regulatory Scheme

In a typical clearing arrangement, a clearing firm provides many backroom and administrative functions for another broker-dealer's customer accounts. *See* Gerald B. Cline and Raymond L. Moss, Liability of Clearing Firms: Traditional and Developing Perspectives, 1062 *PLI/Corp.* 139, 143 (1998). Generally, the clearing firm is responsible for maintaining records and mailing customer account documentation, as well as receiving, maintaining and delivering customers' securities and funds. *See id.;* Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 *Bus. Law.* 841, 841 (1993). The clearing firm may also extend credit in order to finance customer transactions in margin accounts or, in some cases, may execute transactions on exchanges or on the over-the-counter markets. *See id.* Meanwhile the broker-dealer, referred to as the 'introductory broker', maintains many of the functions that require direct personal contact with customers, such as soliciting customers, providing investment advice, and accepting customer orders for the purchase or sale of securities. *See id.*

According to Rule 382 of the New York Stock Exchange ("NYSE"), as amended in 1982, a clearing agreement must "specifically identify and allocate the respective functions and responsibilities of the introducing and carrying organizations ...." *Ross v. Bolton,* 904 F.2d 819, 825 (2d Cir. 1990) (quoting Rule 382, reprinted in NYSE Guide (CCH) ¶ 2382). The Rule also requires that a customer whose account has been "introduced" to a clearing firm receive notice of the existence of the clearing agreement introductory broker and clearing firm, and a notice of the allocation of responsibilities between them. *See* NYSE Rule 382.

### B. The Parties and Relevant Non-Parties

In June or early July 1995, Bear and Baron entered into an Agreement for Securities Clearing Services (the "Clearing Agreement").[2] *See* Award, Ex. A to Declaration of Michael D. Schissel, attorney for defendants ("Schissel Dec."), at 16. At that time, Richard Harrington was President of BSSC and in charge of its clearing business, Peter Murphy was a Managing Director of BSSC and Andrew Bressman was President of Baron. In September, 1995, claimant Bernard McDaniel opened a brokerage account with Baron. *See* Statement of Claim, Ex. B to Schissel Dec., ¶ 3. He opened another account with Baron in late April 1996, this time with his wife, Maureen McDaniel. *See* Exs. C–2, R–18.[3] Roman Okin eventually became Claimants' broker at Baron.

Pursuant to the Clearing Agreement, Bear was required to notify Baron's customers "in writing concerning the respective obligations of the parties ... and any other Customer related responsibilities of the parties to [the] Agreement." Ex. R–31 at 2. Claimants and Bear entered into a standard, pre-printed Customer Agreement with respect to both of their accounts.[4] *See* Award at 15; Ex. R–5. The

---

**2.** Bear had previously cleared for Baron between 1992 and 1993. *See* Award at 16.

**3.** Respondents' exhibits from the arbitration hearing are designated with the prefix "R" and Claimants' exhibits from the arbitration hearing are designated with the prefix "C". These exhibits are attachments to the transcript compiled by Bear from audio tapes of the arbitration hearing.

**4.** Although Claimants insisted that they were unaware that Bear cleared for Baron and disclaimed recollection of receiving a Customer Agreement or Rule 382 Letter, *see* 4/24 Transcript ("Tr.") at 197–99, the Panel found that they did in fact execute the Agreement,

Agreement set forth the terms and conditions under which Bear would transact business with Claimants. *See id.* Among other things, the Agreement explained how Bear would maintain Claimants' accounts, provide reports of executed orders and statements of Claimants' accounts. *See id.* It also stated that Bear was permitted to charge commissions and other fees to Claimants for execution, custody or any other services furnished to Claimants, and that Claimants agreed to pay any such commissions and fees at Bear's then-prevailing rates. *See id.* In Paragraph Seven of the Customer Agreement, Claimants acknowledged receiving Bear's 'Truth–in–Lending disclosure statement', typically called a 'Rule 382 Letter', which described the allocation of functions and responsibilities between Baron and Bear. *See* Exs. R–3 ¶ 7; R–7.

During the time when Claimants maintained their accounts with Baron, Baron engaged in criminal activity, securities laws violations and fraudulent activity, some of which affected Claimants' accounts. *See* Award at 14; Respondents' Memorandum of Law in Support of Their Motion to Vacate and in Opposition to the Petition to Confirm the Arbitration Award ("Def.Mem.") at 20. On May 29, 1996, the Securities and Exchange Commission ("SEC") issued an emergency temporary cease-and-desist order against Baron, Bressman and Okin to halt Baron's fraudulent trading practices. Baron ceased doing business at the end of June 1996, and filed a Chapter 11 bankruptcy petition on July 3, 1996. *See* Statement of Claim, ¶¶ 21–22. On July 11, 1996, upon the application of the Securities Investor Protection Corporation ("SIPC"), Baron was placed into liquidation under the control of an independent trustee. *See* Def. Mem. at 15; SEC Order Instituting Proceedings ("Bear's OIP"), Ex. C–7 at 21 n. 1. On May 13, 1997, Baron and thirteen of its officers and employees were indicted on charges of criminal securities fraud. *See* Bear's OIP at 21 n. 3. With the exception of John McAndris, Baron's former Chief Financial Officer, all of the defendants pled guilty to enterprise corruption and grand larceny. *See id.* McAndris was tried and, on February 26, 1998, he was found guilty on twenty-five charges. *See id.*

The Baron investigation led to an investigation of Bear's relationship with Baron. *See* Def. Mem. at 20. On August 5, 1999, Bear consented to the SEC's entry of an Order Instituting Proceedings (the "OIP"), without admitting or denying the SEC's findings.[5] *See* Bear's OIP at 20 n. 1; SEC Order Instituting Proceedings ("Harrison's OIP"), Ex. C–6, at 2; Respondents' Reply Memorandum in Support of Their Motion to Vacate and In Opposition to the Motion to Confirm the Arbitration Award ("Def.Repl.") at 6. Pursuant to the settlement agreement, Bear was required to pay a $5 million civil penalty and $30 million to a fund to satisfy the claims of Baron's customers. *See* Def. Mem. at 36; Ex. C–7 at 20. In addition, Bear was required to retain an Independent Consultant to recommend supervisory and compliance policies which BSSC was required to adopt. *See* Def. Mem. at 36–37; Ex. C–7 at 19–20.

### C. Claimants' Allegations Against Bear

On January 27, 1997, Claimants filed a Statement of Claim with the National As-

---

*see* Award at 15. Claimants are not contesting this factual finding.

5. The SEC found that Bear: (1) caused violations of the antifraud provisions of the federal securities laws in connection with its clearing relationship with Baron, (2) aided and abetted and caused Baron's violations of the SEC's net capital and contingency offering rules, and (3) violated the SEC's credit-extension and record keeping rules. *See* Bear's OIP.

sociation of Securities Dealers ("NASD") against Bear Stearns, BSSC and Michael Davis, a Baron employee who helped handle Claimants' account. *See* Statement of Claim. Claimants alleged that Bear caused them to suffer losses of not less than $900,000 during the period from the Fall of 1995 to the Summer of 1996. They alleged that Bear was liable to them under the following theories: control person liability, failure to register Baron as an 'approved person' pursuant to NYSE requirements, violations of NYSE Rule 382, issuance of false and misleading confirmations and statements in violation of SEC Rule 10b–10 and NASD Rule 2230, breach of duty of fair dealing in violation of NASD Rule IM 2310–2(a)(1) and IM 2310–2(d), violations of credit requirements and Regulation T [12 C.F.R. § 220.8(d)], breach of contract, negligence, fraud, alter-ego liability for Baron's wrongful acts, aiding and abetting Baron's conversion and fraud, and refusal to honor transfer instructions. *See id.* ¶¶ 70–94. They sought compensatory damages, punitive damages of three times compensatory damages, and all costs of the proceeding. *See id.* ¶¶ 95–96. In its Answer, Bear asserted the following affirmative defenses: failure to state a claim, failure to investigate, notice of Baron's misconduct and ratification of that misconduct, loss causation on the part of Claimants, assumption of risk, waiver, and estoppel. *See* Amended Answer, Ex. D. to Schissel Dec., ¶¶ 66–80.

### D. Arbitration Proceedings

Arbitration hearings took place in Boston on April 25, 26, 27, and 30 and May 1, 2001.[6] *See* Petition ¶ 9. On April 25, Claimants filed a Motion in Limine seeking to offer into evidence the OIPs relating to

Bear and Harrington. *See* Award at 9. After considering the submissions and the oral arguments of the parties, the Panel granted Claimants' motion subject to various conditions. *See* Award at 10; *see also infra* Part I.E.2 (discussing conditions). On April 26, 2001, Bear made an oral motion to admit as evidence the "Wells Submission," a memorandum Bear had submitted in connection with the SEC's administrative proceedings relating to the Bear–Baron relationship. *See* Award at 10; Ex. R–27. After hearing oral argument, the Panel granted Bear's motion. *See id.* at 10–11. The Panel admitted the body of the Wells Submission and most of the exhibits to that document, but did not accept into evidence the attached trial testimony and deposition transcripts. *See id.* at 11.

The presentation of evidence concluded on May 1, 2001. *See id.* at 12. The parties declined the opportunity to present oral closing arguments and opted instead to file post-hearing briefs. *See id.; see also* Claimants' Post–Hearing Brief ("Pl. Post–Hear.Mem."), Ex. G to Schissel Dec.; Respondents' Post–Hearing Memorandum ("Def.Post–Hear.Mem."), Ex. H to Schissel Dec. Proceedings ended on June 12, 2001, upon the filing of the post-hearing briefs. *See* Award at 13.

### E. The Arbitration Award

The Panel issued its Award on July 31, 2001. The Panel found Bear liable for aiding and abetting Baron's fraud and for breach of contract. *See id.* at 18, 23. Specifically, the Panel found that Bear aided and abetted Baron's fraud because it: (1) was "aware of Baron's fraud," (2) "assisted and helped conceal Baron's fraud" by engaging in activities "above and beyond

---

**6.** As members of the NASD, Bear Stearns and BSSC were required to arbitrate Claimants' claims pursuant to Article VIII § 1(a)(4) of the By–Laws of the NASD and NASD Rule 10301(a) as well as a written agreement between the parties. *See* Petition ¶ 4.

those involved in a normal back-office, clearing operation," and (3) "proximately caused the primary harm of Baron's fraudulent and unlawful conduct against customers such as Claimants." *Id.* at 22–24. Breach of contract liability was based on the Panel's finding that Bear had breached the duty of good faith and fair dealing created by the Customer Agreement between Claimants and Bear. *See id.* at 15–18. In particular, the Panel found that Bear breached this duty by: (1) failing to disclose Baron's commissions and markups on account statements generated by Bear, (2) failing to honor Claimants' requests to transfer their account, and (3) being "unresponsive" in its dealing with Claimants after Baron went out of business. *See id.*

The Panel awarded Claimants $600,000 in compensatory damages and $211,571.60 in prejudgment interest on those damages. *See id.* at 26, 28–31. It explained that, although Claimants had suffered $788,988 in damages, those damages would be reduced to $600,000 because Claimants had contributed to and compounded their own losses. *See id.* at 26. The Panel also awarded Claimants $1 million in punitive damages, $25,000 as a sanction for delay caused by Bear, and $75,000 in attorney's fees as a sanction against Bear for failure to cooperate with discovery. *See id.* at 29, 31. It also held that Bear should be responsible for two-thirds of the forum fees. *See id.* at 28. All of the compensatory award and all but $68,135.60 of the prejudgment interest was offset by the $743,436 that Claimants had already received from the restitution fund financed by Bear. *See id.* at 27–28.

## II. LEGAL STANDARD

"Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Willemijn Houdstermaatschappij*, 103 F.3d at 12 (quotation marks omitted). The Federal Arbitration Act (the "FAA") lists specific instances where an award may be vacated. *See* 9 U.S.C. § 10(a). Of relevance to this action are the provisions permitting vacatur when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the … matter submitted was not made," or where the arbitrators were guilty of "misconduct in … refusing to hear evidence pertinent and material to the controversy."[7] 9 U.S.C. § 10(a). Where arbitrators are accused of exceeding their powers, a court must ask "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997). Arbitrators' determinations regarding admission of evidence are not open to review "except where fundamental fairness is violated." *Polin v. Kellwood Co.*, 103 F.Supp.2d 238, 261 (S.D.N.Y.2000) (quoting *Tempo Shain Corp. v. Bertek*, 120 F.3d 16, 20 (2d Cir.1997)). Arbitrators are only required to hear proffered evidence that is "pertinent and material," and their determination of what is "pertinent and material" will only be deemed erroneous if it "deprives a party of a fundamentally fair arbitration process." *Id.* (quoting *Bell*

---

**7.** The other grounds for vacatur listed in the FAA are (1) the award was procured by corruption, fraud or undue means, (2) the arbitrators exhibited "evident partiality" or "corruption," or (3) the arbitrators were guilty of "misconduct in refusing to postpone the hear- ing, upon sufficient cause shown," or guilty of "any other misbehavior" that prejudiced the rights of any party. 9 U.S.C. § 10(a). Bear does not argue that any of these provisions apply.

*Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of Am.,* 500 F.2d 921, 923 (2d Cir.1974)).

The Second Circuit has also recognized that a court may vacate an arbitration award that was rendered in "manifest disregard of the law." *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 28 (2d Cir. 2000); *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998). However, "[r]eview for manifest error is 'severely limited'." *Greenberg,* 220 F.3d at 28 (quoting *DiRussa,* 121 F.3d at 821). The Second Circuit has cautioned that "manifest disregard clearly means more than error or misunderstanding with respect to the law." *Halligan,* 148 F.3d at 202 (quotation marks omitted). Specifically, a court may not vacate an arbitration award unless it finds that: "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Greenberg,* 220 F.3d at 28 (citing *DiRussa,* 121 F.3d at 821).

In very limited situations, a court may vacate an award because arbitrators have manifestly disregarded the evidence. *See Halligan,* 148 F.3d at 202 (vacating an award where arbitrators "manifestly disregarded the law or the evidence or both"); *Beth Israel Med. Ctr. v. Local 814,* No. 99 Civ. 9828, 2000 WL 1364367, at *6 (S.D.N.Y. Sept.20, 2000); *Green v. Progressive Mgmt. Inc.,* No. 00 Civ. 2539, 2000 WL 1229755, at *2 (S.D.N.Y. Aug. 29, 2000) (noting that *Halligan* extends "manifest disregard" standard to review of the evidence); *Daily News, L.P. v. Newspaper & Mail Deliverers' Union of New York and Vicinity,* No. 99 Civ. 5165, 1999 WL 1095613, at *7 (S.D.N.Y. Dec.2, 1999) (same). "[J]udicial review of an arbitrator's factual determinations is quite limited." *Beth Israel Med. Ctr.,* 2000 WL

1364367, at *6. A court may only vacate an arbitrator's award for manifest disregard of the evidence if "there is 'strong evidence' contrary to the findings of the arbitrator and the arbitrator has not provided an explanation of his decision." *Id.* (citing *Halligan,* 148 F.3d at 204; *Daily News,* 1999 WL 1095613, at *7; *Greenberg,* 1999 WL 642859, at *1). A court may not review the weight the arbitration panel accorded conflicting evidence. *Id.* (citing *Campbell v. Cantor Fitzgerald & Co.,* 21 F.Supp.2d 341, 349 (S.D.N.Y.1998), *aff'd,* 205 F.3d 1321, 1999 WL 1424999 (2d Cir. 1999)); *Sobol v. Kidder, Peabody & Co., Inc.,* 49 F.Supp.2d 208, 216 (S.D.N.Y.1999) (citing *Chisolm v. Kidder, Peabody,* 966 F.Supp. 218, 229 (S.D.N.Y.1997), *aff'd,* No. 97–7828, 1998 WL 695041 (2d Cir.1998)). Nor may a court question the credibility findings of the arbitrator. *See Beth Israel Med. Ctr.,* 2000 WL 1364367, at *6 (citing *Campbell,* 21 F.Supp.2d at 349); *Greenberg,* 1999 WL 642859, at *1 ("The Court will not second-guess the credibility findings of the arbitration panel.").

The party seeking vacatur of an arbitration award bears the burden of proving manifest disregard. *See Greenberg,* 220 F.3d at 28 (citing *Willemijn Houdstermaatschappij,* 103 F.3d at 12). But, even if that party proves that the arbitrators' decision is based on a manifest error of fact or law, a court must nevertheless confirm the award if grounds for the decision can be inferred from the facts of the case. *See Willemijn Houdstermaatschappij,* 103 F.3d at 13; *Green,* 2000 WL 1229755, at *2.

## III. DISCUSSION

### A. Aiding and Abetting Award

Bear claims that the Panel's finding of aiding and abetting fraud should be vacated because the Panel: (1) manifestly disregarded well-settled law regarding clearing

firm liability for acts of an introductory firm; (2) manifestly disregarded the evidence in finding the intent required to establish aiding and abetting fraud; (3) manifestly disregarded the burden of proof required for aiding and abetting fraud; and (4) failed to find proximate cause.

### 1. Manifest Disregard for the Law [8]

#### a. The Law on Clearing Firm Liability

Under New York law, the elements for a claim of aiding and abetting fraud are: (1) an existing fraud, (2) knowledge of the fraud, and (3) substantial assistance to advance the fraud's commission. *See Cromer v. Berger*, 137 F.Supp.2d 452, 470 (S.D.N.Y.2001) (citing *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000)). Generally, "substantial assistance" exists where: (1) a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed," and (2) "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir.1992); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999); *Kolbeck v. LIT Am., Inc.*, 939 F.Supp. 240, 249 (S.D.N.Y.1996)). Where defendant does not owe a fiduciary duty directly to the plaintiffs, however, mere "inaction" by the defendant cannot constitute "actionable participation." *Id.* (citing *Kolbeck*, 939 F.Supp. at 247); *see also Stander v. Fin. Clearing & Svcs.*, 730 F.Supp. 1282, 1287 (S.D.N.Y.1990). Indeed, "the 'scienter' requirement scales up-

ward," and plaintiffs have the additional burden of showing that the assistance rendered is "both substantial and knowing;" in other words, there must be "something close to an actual intent to aid in fraud" or "scienter of the 'conscious intent' variety." *Ross v. Bolton*, 639 F.Supp. 323, 327 (S.D.N.Y.1986) *aff'd*, 904 F.2d 819 (2d Cir. 1990) (quoting *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979) and *IIT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 925 (2d Cir.1980)).

It is well-settled that, when a clearing firm acts merely as a clearing agent, it owes no fiduciary duty to the customers of its introducing broker and cannot be held liable for the acts of an introducing firm. *See Greenberg*, 220 F.3d at 29; *Carlson v. Bear, Stearns & Co.*, 906 F.2d 315, 318 (7th Cir.1990); *Warren v. Tacher*, 114 F.Supp.2d 600, 603 (W.D.Ky.2000); *Cromer*, 137 F.Supp.2d at 470; *Connolly v. Havens*, 763 F.Supp. 6, 10 (S.D.N.Y.1991); *Dillon v. Militano*, 731 F.Supp. 634, 636 (S.D.N.Y.1990); *Stander*, 730 F.Supp. at 1286. As the Second Circuit clearly stated:

> The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.

*Greenberg*, 220 F.3d at 28 (quotation marks omitted). Moreover, courts have refused to hold clearing firms liable for the practices of introducing brokers even where the clearing firm continued to provided clearing services after it knew or should have known of the introducing broker's fraudulent scheme. *See Ross*, 639

---

**8.** Claimants argue that Bear may not claim "manifest disregard" because it has not provided the Court with the full arbitration record. *See* Petitioners' Memorandum of Law in Support of Motion to Confirm and in Opposi-

tion to the Motion to Vacate the Arbitration Award ("Pl.Opp.") at 6–7. Because Bear filed a copy of the official record, in the form of audio tapes of the arbitration hearing, this argument has no merit.

F.Supp. at 327 (dismissing claim against Bear for aiding and abetting the fraud of an introducing broker where "the complaint does not specify what assistance Bear Stearns rendered other than to continue to clear transactions when it 'knew or should have known' that" the introductory firm was engaging in fraud); *In re Blech Secs. Litig.*, 961 F.Supp. 569, 584 (S.D.N.Y.1997) ("*Blech II* ") ("Even assuming Bear Stearns had knowledge of the [introductory firm's] scheme, primary liability [under Section 10(b) ] cannot attach when the fraudulent conduct that is alleged is no more than the performance of routine clearing functions."); *In re Blech Secs. Litig.*, 928 F.Supp. 1279, 1295–96 (S.D.N.Y.1996) ("*Blech I* "); *Connolly*, 763 F.Supp. at 10.

■ On the other hand, where a clearing firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the introductory broker's actions, it may expose itself to liability with respect to the introductory broker's misdeeds. *See Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y.2000) (finding plaintiffs' claim against Bear viable where complaint alleged that Bear "shed [its] role as a mere clearing broker for [Baron], and with actual knowledge, directly participated in the heretofore described scheme."); *Koruga v. Fiserv Correspondent Servs.*, 183 F.Supp.2d 1245, 1247 (D.Or.2001) (confirming arbitration award finding clearing firm and introductory broker jointly and severally liable for fraud where "panel made specific factual findings that [clearing firm] was directly involved in the challenged transaction and materially participated in the wrongdoing."); *Blech II*, 961 F.Supp. at 585 (finding complaint against clearing firm viable where plaintiffs alleged that Bear engaged in activities that did not "reflect ... the standard practice of [a] clearing broker."); *Hirata v. J.B. Oxford & Co.*, 193 F.R.D. 589, 600 (S.D.Ind.2000)

(denying clearing firm's motion to dismiss because facts might establish that clearing firm "materially aided" introductory broker's securities law violation); *Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc.*, 572 F.Supp. 1475, 1480–81 (D.Mass. 1983) (denying clearing firm's motion to dismiss 10b–5 claim where complaint alleged "a very close relationship" between clearing firm and introductory broker); *Cannizzaro v. Bache, Halsey, Stuart, Shields, Inc.*, 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (denying motion to dismiss aiding and abetting claim against clearing firm where facts might show that clearing firm performed more than mere mechanical functions for introductory broker); *see also*, Michael G. Shannon, "Clearing Firm Liability—Has the Dam Really Cracked?," 1196 *PLI/Corp.* 677, 690–97 (Aug.2000); Gerald B. Kline & Raymond L. Moss, "Liability of Clearing Firms: Traditional and Developing Perspectives," at 144 ("[A] clearing broker may suffer liability exposure when it moves beyond performing its routine clearing functions or pressures the introducing broker to act wrongfully.").

### b. The Panel Did Not Ignore the Law

As an initial matter, the Panel did not "ignore" the law on clearing firm liability. To the contrary, the Panel cited and discussed several cases denying clearing firm liability, explaining that Bear's involvement in Baron's affairs went "far beyond" the factual patterns in those cases. Award at 25. Thus, the case law denying clearing firm liability was distinguished, not ignored.

### c. The Panel Did Not Refuse to Apply the Law

■ Bear argues that, although the Panel "paid lip service" to the law on clearing firm liability, it "did not honor"

these legal principles when it found that Bear's involvement in Baron's activities went beyond the ordinary clearing function. Def. Mem. at 31. Recent New York and Southern District decisions involving Bear's clearing operations are instructive in distinguishing between normal clearing operations, which do not expose a clearing firm to liability for its introducing broker's misconduct, and activity which is active and direct, for which liability may attach.

In *Blech I*, Judge Robert Sweet of this Court dismissed a claim of manipulation against Bear on the ground that Bear's activity as a clearing firm, standing alone, was not grounds for liability. *See* 928 F.Supp. at 1295. The next year, in *Blech II*, the court denied Bear's motion to dismiss the amended complaint, finding that the amendments alleged direct action by Bear Sterns that went beyond ordinary clearing functions. *See* 961 F.Supp. at 585. Among other things, the amended complaint alleged that:

- Bear was motivated to artificially inflate the market prices for Blech Securities by its desire to decrease its own risk of loss and eliminate the debit balance outstanding at Bear;
- Bear had "access to confidential, non-public information concerning Blech Co.'s financial condition, liquidity, and net capital position;"
- Bear had the "power to extend or deny credit to Blech & Co. based upon the value of Blech Securities held as collateral," and "the power and control to determine whether or not to execute securities transactions on behalf of Blech & Co. and its clients;"

- Bear demanded that Blech sell certain securities in order to reduce the debt owed to Bear and eliminate Bear's own exposure.

*Id.* at 577–78. Based on these allegations, Judge Sweet found that the alleged "pressure exerted by Bear Stearns on Blech to reduce Blech's debit balance, when combined with Bear Stearns' knowledge of Blech's sham trading and its clearing of such trades does not 'reflect ... the standard practice of [a] clearing broker'." *Id.* at 585 (quoting *Blech I*, 928 F.Supp. at 1295) (ellipse and parenthesis in original).

In *Cromer Finance*, Judge Denise Cote of this Court held that plaintiff investors failed to state a claim for aiding and abetting fraud against Bear where Bear had acted as the clearing firm for an off-shore investment fund. *See* 137 F.Supp.2d at 471–72. The court held that plaintiffs' allegations that Bear "fail[ed] to enforce margin requirements, or continu[ed] to execute trades despite margin violations" or "execut[ed] trades in order to reduce 'a loan of money under margin'" did not make out a claim of "substantial assistance".[9] *Id.* (citing *Dillon*, 731 F.Supp. at 637, 639; *Stander*, 730 F.Supp. at 1287 and quoting *Ross*, 639 F.Supp. at 327).

In *Schwarz v. Bear, Stearns & Co.*, No. 603795/97, 1998 WL 672708 (Sup.Ct. N.Y.Co. Aug. 24, 1998), *aff'd*, 266 A.D.2d 133, 698 N.Y.S.2d 855 (1st Dep't 1999) (mem.), a case involving Bear's activities as clearing agent for Baron, the New York Supreme Court dismissed plaintiffs' complaint for failure to state a claim. In a summary paragraph, the Complaint alleged:

---

**9.** Plaintiffs attempted to allege "substantial assistance" by alleging that Bear: (1) over-extended margin credit to the fund in violation of the margin regulations of the FED and the NYSE, as well as Bear's own institutional rules, (2) permitted the fund to violate the concentration limitations ordinarily applied by Bear, and (3) allowed the fund to continue trading instead of freezing the fund's account when it was required by regulations to do so. *See Cromer Finance*, 137 F.Supp.2d at 471.

A.R. Baron was able to engage in this massive fraud only because Bear, Stearns provided the firm with the necessary administrative, carrying and clearing functions to stay in business. Had Bear, Stearns refused, based on its knowledge of A.R. Baron's activities to provide its institutional support to A.R. Baron, that firm would have closed its doors on July 20, 1995 and its customers would not have been defrauded after that date.

Shannon, "Clearing Firm Liability—Has the Dam Really Cracked?" at 698 (quoting *Schwarz* complaint). The *Schwarz* court held that plaintiffs' causes of action for negligence and negligent misrepresentation must fail because "[it] is undisputed that Bear Stearns was acting as Baron's clearing broker at the time plaintiff's alleged losses were sustained [and][i]t has been determined that 'as a matter of law, a clearing broker owes no duty of disclosure to the clients of an introductory broker.' " *Schwarz*, 1998 WL 672708 at *2 (quoting *Blech I*, 928 F.Supp. at 1295–96); *see also Schwarz*, 698 N.Y.S.2d at 855 ("[D]efendants, as clearing brokers, had no duty to disclose to the introducing broker's clients, and thus the statutory cause of action, as well as the negligence claim, were properly dismissed.").

In *Berwecky*, which also involved allegations against Bear as clearing agent for Baron, Judge John Sprizzo of this Court sustained the complaint against Bear. *See* 197 F.R.D. at 68 (granting class certification); 10/20/98 Order of Judge Sprizzo, Ex. C. to Declaration of Jonathan Kord Lagemann, counsel for plaintiffs ("Lagemann Dec. No. 1") (denying Bear's motion to dismiss). In that case, plaintiff alleged that Bear "shed [its] role as a mere clearing broker for A.R. Baron, and with actual knowledge, directly participated in the heretofore described scheme." 197 F.R.D. at 67. Specifically, the complaint alleged that after Baron was sanctioned by the NASD, Bear "asserted control over Baron's trading operations" by: (1) "placing Bear, Stearns' employees at Baron's offices to observe Baron's trading activities," (2) "approving or declining to execute certain trades," (3) "imposing restrictions on Baron's inventory," and (4) "loaning funds to Baron." *Id.* The complaint further alleged that Bear took these actions "in order to keep A.R. Baron a viable concern while Bear, Stearns and Harrington continued to reap the large profits that they received from their activities with A.R. Baron." *Id.* In light of these allegations, Judge Sprizzo concluded that plaintiffs had a viable claim against Bear for knowing participation in Baron's fraudulent scheme. *See id.* at 68; 10/20/98 Order of Judge Sprizzo.

The most recent Southern District case involving Bear's role as clearing agent is *Goldberger v. Bear Stearns & Co. Inc.*, No. 98 Civ. 8677, 2000 WL 1886605 (S.D.N.Y. Dec.28, 2000). In *Goldberger*, Judge John Martin of this Court granted Bear's motion to dismiss the complaint alleging that Bear knowingly participated in price manipulation by the introductory broker. *Id.* at *5. Distinguishing the case from *Berwecky* and *Blech II*, Judge Martin explained:

Here, there are no allegations that Bear Stearns instigated trading that it "knew or should have known would result in fraudulent trades that would artificially inflate the price" of the manipulated securities. Nor are there allegations that Bear Stearns "asserted control over [the Introducing Brokers'] trading operations by, *inter alia*, placing Bear, Stearns' employees at [their] offices to observe [their] trading activities, approving or declining to execute certain trades, imposing restrictions on [their] inventory, and loaning funds to [them]." ... the complaint does no more than allege that Bear Stearns performed the normal function of a clearing broker.

*Id.* at *6 (quoting *Blech II,* 961 F.Supp. at 584–85; *Berwecky,* 197 F.R.D. at 67) (parentheses in original).

In the instant case, the Panel listed nine "key factual elements" that constituted Bear's "active participation, substantial assistance and aiding and abetting." Award at 24. It found that Bear:

(1) either understood or did not report commissions and markups to customers with the result that Baron was able to conceal its unlawful conduct, (2) processed trades and gave Regulation T extensions on trades which were unpaid by customers and which Bear knew or had reason to know were unauthorized, (3) made loans above and beyond normal clearing debt to help Baron meet net capital requirements, (4) continued clearing, rescinded clearing termination notices, and resumed clearing after Baron went off the box with knowledge of Baron's unlawful and fraudulent conduct, (5) intervened on behalf of Baron with NASD and assisted Baron in the NASD net capital acquisition and approval process, (6) monitored, supervised, and restricted trading by Baron, including requiring, restricting, and not processing certain trades, (7) became actively involved in Baron operations by placing Bear employees on Baron's premises, (8) was aware of, communicated with Baron about, and attempted to monitor customer complaints, and (9) collaborated closely with Baron regarding Baron's affairs.

*Id.* In addition, the Panel found that Bear, in order to protect against its credit risk, restricted certain trades which would have benefitted Baron's customers and, in some instances, required Baron to increase certain transactions to the detriment of its customers. *See id.* at 20–22. Based on these factual findings, the Panel concluded that Bear's involvement in Baron's affairs went "above and beyond those involved in a normal back-office, clearing operation." Award at 22; *see also id.* at 24 ("Bear's actions and involvement in Baron's affairs were not merely routine clearing functions . . ."); *id.* ("Bear took numerous actions to involve itself in Baron's business and financial affairs and assist Baron . . . these actions being far above and beyond those of a normal back-office, clearing operation.").

Bear argues that the activities listed by the Panel "simply describe the activities directly related to Bear Stearns' clearing role." Def. Mem. at 31. As Bear correctly points out, some of these "key factual elements" are clearing-related functions that are insufficient, on their own, to support a finding of 'substantial assistance'. *See id.* at 22–24. Nevertheless, some of the activities identified by the Panel have been found to be beyond mere clearing functions by other courts. *See Berwecky,* 197 F.R.D. at 67 (complaint alleged that Bear placed employees at Baron's offices to observe Baron's trading activities, approved or declined to execute certain trades, imposed restrictions on Baron's inventory, and loaned funds to Baron); *Blech II,* 961 F.Supp. at 578 (complaint alleged that Bear required its introducing broker to take actions that reduced Bear's credit risk but were detrimental to customers); *see also Goldberger,* 2000 WL 1886605, at *3 (recognizing that activities described in *Berwecky* and *Blech II* are beyond normal clearing functions). Thus, the Panel did not refuse to apply the law when it found that Bear's activities, taken as a whole, exposed it to liability for aiding and abetting Baron's fraud. *See Berwecky,* 197 F.R.D. at 68; *Blech II,* 961 F.Supp. at 585.

### 2. Manifest Disregard of the Evidence

■ Bears also argues that the Panel's finding of fraudulent intent—an essential

element of aiding and abetting fraud—was in manifest disregard of the evidence. It argues that the Panel's determination that Harrington and Bressman were "close personal friends" was "a fiction" created by the Panel and that, without this factual finding, the Panel could not have determined that Bear acted with the requisite fraudulent intent.[10] Def. Mem. at 16, 19–30 (quoting Award at 19). According to Bear, the Panel had to "manufactur[e]" this finding of fact because it knew that a mere finding that Bear was on notice of Baron's fraud or that Bear knowingly or recklessly disregarded several indicia of fraud was insufficient evidence of fraud. *See* Def. Mem. at 30.

Bear's argument does not justify vacatur because Bear has not proven that the Panel manifestly disregarded "strong evidence contrary" to the contested factual finding. *Beth Israel Med. Ctr.,* 2000 WL 1364367, at \*6 (quotation marks omitted). Neither Harrington nor Bressman testified at the hearing, so there is no direct evidence with regard to their personal relationship.[11] The only witness with knowledge of Harrington's relationship with Bressman was Murphy, who testified that "[t]hey seemed to have a good, you know, a good relationship on some level." 4/26 Tr. at 158. He also testified that Bressman had free access to Harrington's office other than through the front door so that Murphy "used to joke and wonder how he did it," and that Harrington allowed Bressman to taunt Murphy in Harrington's presence and to make remarks such as "it's funny to

see Murphy frustrated or running around." *Id.* at 159.

With respect to Murphy's testimony, the Panel found that "Murphy knows much more than he was willing to say in his testimony," and explained that it "took that into consideration in making its findings and conclusions." Award at 23. To the extent that the Panel believed that Murphy was concealing his true knowledge of Harrington's relationship with Bressman, it was entitled to do so, and this Court has no authority to question the credibility findings of the arbitrators. *See Beth Israel Med. Ctr.,* 2000 WL 1364367, at \*6 (citing *Campbell,* 21 F.Supp.2d at 349). Because the Panel could have inferred from Murphy's testimony that Harrison and Barrington were close personal friends, and Bear has provided no evidence to the contrary, Bear has not met its burden of proving that the Panel manifestly disregarded the evidence.

Even absent this factual finding, the Panel could have inferred fraudulent intent. Fraudulent intent may be inferred from facts showing either (1) circumstances indicative of conscious misbehavior, or (2) a motive for participating in a fraudulent scheme and an opportunity to do so. *See Primavera,* 130 F.Supp.2d at 507; *Blech II,* 961 F.Supp. at 582–83. Here, the Panel found evidence to support both of these tests.

*First,* the Panel found that Bear had actual knowledge of Baron's fraud. *See*

---

**10.** Claimants argue that Bear's position is not logically sound because Bear provided no evidence that the Panel *knew* that it had to find fraudulent intent. *See* Pl. Opp. at 33–34. Although fraudulent intent is not mentioned anywhere in the Award and Bear did not specifically inform the arbitrators of any fraudulent intent requirement in its post-hearing briefs, I will assume that the Panel knew that Claimants had to prove fraudulent intent based on the cases cited in the Award. *See*

Award at 24 (citing *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 507 (S.D.N.Y. 2001); *Nigerian Nat'l Petroleum,* 1999 WL 558141, at \*7).

**11.** Prior to the hearing, the Panel granted Bear's request for a subpoena duces tecum to Harrington, but Bear never availed itself of the opportunity to take his deposition. *See* Award at 6.

Award at 24 ("[Bear was] aware of Baron's risky circumstances and fraud.") ("[Bear had] knowledge of Baron's unlawful and fraudulent conduct."). *Second*, the Panel found that, even if Harrington and Bressman had not been close personal friends, Bear had both the motive and the opportunity to engage in Baron's fraud. One factor motivating Bear was the simple desire to continue to collect clearing fees and other income it received from Baron as part of the Clearing Agreement. *See* Award at 19. As Bear properly notes, the mere desire "to prolong the benefits" of an ordinary clearing relationship is not enough to support the scienter element of an aiding and abetting claim. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994); *see also* Def. Mem. at 30 (citing *In re Solucorp Indus. Secs., Ltd. Litig.*, No. 98 Civ. 3248, 2000 WL 1708186, at *5 (S.D.N.Y. Nov.15, 2000)). But the Panel also found that Bear was motivated by its desire to recover from Baron's on "loans above and beyond the normal clearing debt"—loans the Panel described as "extraordinary". *Id.* at 21–22. Where a defendant's "economic motives were extraordinary," a court may infer fraudulent intent. *ABF Capital Mgmt. v. Askin Capital Mgmt.*, 957 F.Supp. 1308, 1331 (S.D.N.Y.1997).

Finally, several of the Panel's finding of fact show that Bear had the opportunity to participate in Baron's fraud. Not only did Bear clear Baron's fraudulent transactions, but it also intervened with the NASD on Baron's behalf, helped to conceal Baron's fraud from its customers, exercised control over Baron's trading practices, placed Bear employees on Baron's premises, and extended "loans above and beyond normal clearing debt" to Baron. Award 20–22, 24–25. Accordingly, Harrington and Bressman's "close personal friend[ship]" was not essential to the Panel's finding of fraudulent intent.

### 3. Manifest Disregard for the Burden of Proof

Bear argues that the Panel manifestly disregarded the burden of proof, which requires a claim for aiding and abetting fraud be proven by "clear and convincing evidence." Def. Mem. at 30–31 (quoting *Primavera*, 130 F.Supp.2d at 488). As an initial matter, Bear has misrepresented the standard of proof used by the Panel. *See id.* at 30. Bear states that the Panel based its conclusion on a "preponderance of the evidence" standard, but the Award actually uses the term "*significant* preponderance of the evidence." Award at 23 (emphasis added). While the standard actually employed by the Panel was still not technically correct, this is a question of semantics. The facts the Panel found to constitute a "significant preponderance of the evidence" could also have been described as "clear and convincing evidence." Thus, the Panel's alleged legal error is not a valid ground for vacating the award. *See Willemijn Houdstermaatschappij*, 103 F.3d at 13 (arbitration award will not be vacated where, despite error of law, conclusion is supported by the facts); *Green*, 2000 WL 1229755, at *2 (same).

### 4. Failure to Find Proximate Cause

Bear also argues that the Award should be vacated because the Panel did not find that Bear was the "proximate cause" of Claimants' injuries. *See* Def. Mem. at 25. *First*, Bear suggests that the Panel ignored the law when it "clearly stated that it was basing the Award on its view that Bear Stearns was the 'but for' cause of Claimants' losses." *Id.* at 35 (citing Award at 22). However, Bear again has misrepresented the Panel's conclusions. The words "but for" do not appear on the page of the Award cited by Bear and the Panel explicitly found that Bear's actions "*proximately caused* the primary harm of Baron's fraudulent and unlawful

conduct against customers such as Claimants" and that "[t]he harm was a direct and foreseeable result of Bear's conduct." Award at 24 (emphasis added). Clearly, the Panel did not "ignore" the proximate cause requirement.

■ *Second,* Bear claims that the nine "key elements" of aiding and abetting fraud do not establish "proximate cause." *See* Def. Mem. at 35. I disagree. Proximate cause exists where defendant's actions were "a substantial factor in the sequence of responsible causation," and plaintiff's injury was "reasonably foreseeable or anticipated as a natural consequence." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994). Claimants' injury must either have been "the natural and probable consequence of the fraud" or an injury that Bear "ought reasonably to have foreseen as a probable consequence of the fraud;" Bear need not have foreseen or intended the damages suffered by Claimants. *The City of New York v. Coastal Oil of New York,* No. 96 Civ. 8667, 1999 WL 493355, at *12 (S.D.N.Y. July 12, 1999) (citing *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1496 (2d Cir.1992); *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir. 1986); *Nat'l Commercial Bank v. Morgan Stanley Asset Mgmt. Inc.,* No. 94 Civ. 3167, 1997 WL 634292, at *7 (S.D.N.Y. Oct.15, 1997)). Here, the Panel found that, after Bear became aware of Baron's fraud, it not only continued to clear for Baron, but also engaged in activities beyond its normal clearing function. *See* Award at 22. These actions "either (1) protected Bear at the expense or to the detriment of Baron and Bear customers or (2) assisted Baron to stay in business and engage in unlawful, criminal, and fraudulent activity resulting in the losses and damages suffered by Claimants and numerous other Baron and Bear customers." *Id.* at 23. Based on these facts, the Panel could reasonably have concluded that Bear

"ought reasonably to have foreseen" that Claimants' injury would be "a probable consequence" of its actions. *The City of New York,* 1999 WL 493355, at *12. Accordingly, Bear has not shown that the Panel refused to apply the law of proximate cause.

## B. Breach of Contract Award

Bear argues that the breach of contract award should be vacated because the Panel: (1) exceeded its authority by manifestly disregarding the terms of the contract upon which Claimants' breach claim is based; (2) manifestly disregarded the law regarding a clearing firm's 'duty to disclose'; (3) manifestly disregarded evidence relating to Bear's alleged failure to honor Claimants' transfer requests; and (4) manifestly disregarded the law and the evidence in imposing liability on Bear based on its failure to respond to Claimants' inquiries.

### 1. Manifest Disregard of the Contract Between Bear and Claimants

Bear claims that the Panel exceeded its authority when it "manifestly disregarded the Customer Agreement and the Rule 382 Letter" and "simply imposed its own notions of justice throughout the award." Def. Mem. at 24. Bear recognizes that "all contracts contain a covenant of good faith and fair dealing," but insists that the Panel improperly used this duty to create obligations that detracted from or altered the terms of the Agreement itself. *Id.* at 23 (citing *Primavera,* 130 F.Supp.2d at 531; *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 306 (S.D.N.Y.1998)).

Contrary to Bear's assertion, the Panel did not "disregard" the Customer Agreement. Rather, it thoroughly examined the language and the contours of that Agreement and concluded that the Agreement did not exempt Bear from *all* responsibility to Baron's customers. *See* Award at

15–16. The Panel recognized that the Customer Agreement placed certain limits on Bear's responsibility to Claimants. It noted that the Agreement "provided that Bear carried the accounts as Clearing agent for [Baron]," and that "Bear may accept from the broker without any inquiry or investigation orders for the purchase or sale of securities and any other instructions concerning the accounts or the property of Claimants." *Id.* It also noted that, under the Agreement, "Bear shall have no responsibility or liability to Claimants for any acts or omissions of [Baron], its officers, employees, or agents." *Id.* Finally, the Panel noted that Claimants received from Bear a letter explaining, in accordance with Rule 382, the allocation of responsibilities between Bear and Baron with respect to Claimants' accounts. *See id.* Based on these facts, the Panel recognized that Bear was "entitled to reasonable protection" from "liability for unlawful transactions initiated by broker-dealers." *Id.* at 18.

Nevertheless, the Panel explained, "[t]he Customer Agreements did not say that Bear disclaimed responsibility for its own actions in regard to Claimants' accounts or Baron." *Id.* It further explained that, although Rule 382 permits an allocation of responsibility for various functions between an introductory broker and a clearing firm, the SEC has emphasized that:

> contractual arrangements for the allocation of functions between an introductory firm, such as Baron, and clearing firm, such as BSSC, and recognized by Rule 382 cannot operate to relieve either organization from their respective responsibilities under the securities laws and applicable rules of self-regulatory organizations, such as NASD.[12]

*Id.* (citing Exchange Act Release No. 18497 (Feb. 19, 1982)). Included among the applicable rules of self-regulatory organizations are two rules cited by the Panel—NYSE Rule 401 and NASD IM–2310–2(a)(1) and (d). *See id.* at 16. These rules require all members to "adhere to the principles of good business practice in the conduct of [their] business affair[s]," impose upon members a "fundamental responsibility for fair dealing" with customers and others, require members to "deal fairly with the public," and recognize that "brokers and dealers have an obligation of fair dealing in actions under the general anti-fraud provisions of the federal securities laws." *See* NYSE Rule 401; NASD IM–2310–2(a)(1); NASD IM–2310–2(d). Citing these rules, the Panel concluded: "The Customer Agreements between Bear and Claimants created duties of fair dealing and good faith between the contracting parties ...." Award at 15–16. Thus, far from "creating" or "manufactur[ing]" obligations that contradict the Agreement, Def. Mem. at 23, the Panel relied on an SEC Release as well as NASD and NYSE rules that were implicitly incorporated in the Agreement.[13]

Nor did the Panel manifestly disregard the law regarding the extent of a clearing

---

**12.** As the Panel was surely aware, the Customer Agreement explicitly acknowledges the SEC's position when it states: "All transactions shall be subject to all applicable law and the rules and regulations of all federal, state and self-regulatory agencies ...." Ex. R–5.

**13.** Bear relies on *Schwarz* to argue that the Customer Agreement and the Rule 382 Letter create a more limited relationship between Bear and Claimants than the Panel found.

*See* Def. Mem. at 8–9. It notes that, in dismissing the complaint in *Schwarz*, the court pointed to the Customer Agreement and Rule 382 Letter to show how plaintiff had "expressly acknowledged his relationship, or lack thereof, with Bear Stearns." 1998 WL 672708, at *1. However, *Schwarz* is distinguishable. Whereas plaintiff in *Schwarz* only alleged that Bear cleared Baron's fraudulent transactions, here the Panel found that Bear's

firm's duty to the customers of its introductory broker. The Panel explicitly recognized that "Bear owed no fiduciary duty to Claimants ... as to the basic clearing relationship between Bear and Baron." Award at 26. That said, it concluded that the Customer Agreement created a "duty of good faith and fair dealing." This determination was not contrary to well-established law.

In *RPR Clearing v. Glass*, No. 97 Civ. 0017, 1997 WL 460717, at *2 (S.D.N.Y. July 28, 1997), defendant clearing firm moved to vacate an arbitration award holding it jointly and severally liable with the introductory broker for fraud committed against investors. *See id.* at *2. As in this case, the investors had entered into a customer agreement with the clearing firm that "allocated various responsibilities" between the clearing firm and the introductory firm. *Id.* at *1. While the court recognized that clearing firms owe no fiduciary duty to customers of an introductory firm, it nevertheless confirmed the arbitration award based on the theory that the clearing agreement imposed a duty of "ordinary care." [14] *Id.* at *2. The court explained that merely because "there is no case directly on point holding a clearing broker

liable for a breach of ordinary care, [ ] does not demonstrate a manifest disregard of the law." *Id.* Furthermore, the court noted that in *Stander* Judge Louis Stanton of this Court suggested that a clearing broker may owe some sort of duty to an investor, if not a fiduciary duty. [15] *RPR Clearing*, 1997 WL 460717, at *2 (citing *Stander*, 730 F.Supp. at 1287). Similarly, in *In re Lloyd Sec., Inc.*, No. 90–0985S, 1992 WL 318588, 1992 Bankr.Lexis 1796 (E.D.Pa. Oct. 29, 1992), the court found that the clearing firm's customer agreements and pertinent NYSE and NASD business conduct standards imposed upon the clearing firm a duty to follow "a standard of care consistent with sound business practices." *Id.* at *10 (holding that clearing firm was duty bound to safeguard customer funds). Given the existence of "case law that suggests the possibility of a duty [to customers of an introductory firm], [Bear] has failed to demonstrate the Panel's manifest disregard of the law." *RPR Clearing*, 1997 WL 460717, at *2.

## 2. Manifest Disregard of the Law Regarding 'Duty to Disclose'

The Panel found that the monthly account statement furnished by Bear to

involvement in Baron's fraud went far beyond its performance of normal clearing functions.

14. In *RPR Clearing*, the introductory broker gave the clearing firm forged change of address forms for plaintiffs' accounts, the clearing firm sent all statements to this false address, and the introductory broker was therefore able to loot plaintiffs' accounts without their knowledge. 1997 WL 460717, at *1. The arbitrators did not provide any rationale for their conclusion, but plaintiff argued that the clearing firm breached its duty of "ordinary care" by (1) not checking the signatures on the change of address forms against plaintiffs' authentic signatures, which the clearing firm possessed, and (2) not sending a copy of the change of address form to the investors' original address. *Id.* at *2.

15. In *Stander*, plaintiff claimed that the clearing broker had a duty to inquire into the introductory firms' activities. *See* 730 F.Supp. at 1287. Although the court rejected plaintiff's argument under the particular circumstances of the case, it noted that the customer agreements between the clearing firm and the customer imposed reporting duties on the clearing firm. *See id.* at 1287 & n. 4. Moreover, the court suggested that the clearing firm may have had a duty to examine the introductory firm's activities if it had known or should have known that the authorizations giving the introductory firm power over trading in the customer's account were improper. *See id.* at 1287.

Claimants with respect to transactions in their accounts "were incomplete and materially misleading, in that they omitted or understated and did not fully disclose" the "unlawful, excessive and unauthorized" commissions and markups that Baron was charging to Claimants. Award at 17. According to Bear, this determination imposed upon Bear a "duty of disclosure" that is contrary to well-settled law. Def. Repl. at 9.

*First*, Bear claims that the law is well-settled that "clearing firms have no duty of disclosure to customers of introductory firms." *Id.* (citing *e.g., Blech I*, 928 F.Supp. at 1295–96; *Connolly*, 763 F.Supp. at 10). However, as the Panel stated, "the cases cited by Bear are distinguishable." Award at 18. The Panel explained that, unlike the cases Bear cited, Bear did not simply perform "back office work on behalf of Baron and Claimants, for the accounts of Claimants, with whom Bear had little or no contact." *Id.* Rather, "Claimants were actual customers of Bear, acknowledged by the Customer Agreements which created a direct contractual relationship between Bear and Claimants." *Id.* Moreover, "Bear had extensive contact from and dealings directly with McDaniel." *Id.* Given these findings, it cannot be said that the Panel manifestly disregarded the above cited case law.[16]

*Second*, Bear argues that the district court in *Greenberg* rejected a "nearly identical" attempt to impose a duty of disclosure on Bear in its capacity as a clearing firm. Def. Mem. at 25 (citing *Greenberg*, 1999 WL 642859, at *1). In *Greenberg*, as in this case, claimant argued that Bear owed him a duty to disclose on confirma-

tion statements allegedly enormous profits the introductory broker was making on trades. *See Greenberg*, 1999 WL 642859, at *3. Rejecting this argument, the court stated: "The legal duty of a broker-dealer to notify purchasers of its own self dealing cannot be imposed upon Bear Stearns, a clearing broker that *the panel found was unaware* of [the introductory broker's] fraud." *Id.* (emphasis added). In contrast, the Panel in this case specifically found that Bear "had knowledge of the fraud" committed upon Claimants by Baron. Award at 23.

■ *Third*, Bear claims that the Panel improperly relied on SEC Rule 10b–10 and NASD Rule 2230 to impose upon Bear "a duty to send Claimants monthly account statements which accurately listed the amounts of commissions and rebates being received or charged by Baron." *See* Def. Mem. at 25 (quoting Award at 17). According to Bear, these rules are inapplicable because they only relate to the broker-dealer who transacts business directly with the customer and they only apply to disclosures on trade confirmation slips, not account statements. *See id.* at 25 & n. 19; Def. Rep. at 9. However, even if the Panel erroneously cited these rules as support for its determination that Bear had a duty to disclose, there is case law in this District supporting the Panel's conclusion. In *RPR Clearing*, the court found that a clearing firm breached its "duty of ordinary care" by not sending a confirmation of a forged form to customers who could have detected the introductory broker's fraud. *See* 1997 WL 460717, at *2. Moreover, in *Stander*, the court noted that the agreement between a clearing firm and a

---

16. Though not cited by Bear, *Schwarz* also suggests that a clearing firm has no duty of disclosure. *Schwarz*, 1998 WL 672708 at *2 ("a clearing broker owes no duty of disclosure to the clients of an introductory broker"); *Schwarz*, 698 N.Y.S.2d at 855 ("[D]efendants, as clearing brokers, had no duty to disclose to the introducing broker's clients . . ."). However, as noted earlier, *Schwarz* is distinguishable because plaintiffs only alleged that Bear engaged in ordinary clearing functions.

customer imposes reporting duties on the clearing firm. *See* 730 F.Supp. at 1287 & n. 4. Thus, any possible legal error by the Panel cannot be the basis for vacating the Award.[17] *See Willemijn Houdstermaatschappij*, 103 F.3d at 13 (holding that court must confirm award if there are alternative legal grounds to support the award); *Green*, 2000 WL 1229755, at *2 (same).

The Panel's conclusion that Bear made material and misleading omissions or understatements in violation of its duty of good faith and fair dealing is, by itself, a sufficient basis for holding Bear liable for breach of contract. *See Ainger v. Michigan Gen'l Corp.*, 632 F.2d 1025, 1026 (2d Cir.1980) (omissions or misstatements made in violation of a contractual duty to disclose, with reliance on those statements or omissions, constitutes breach of contract)[18]; *Polycast Tech., Corp. v. Uniroyal Inc.*, 728 F.Supp. 926, 951 (S.D.N.Y.1989) (failure to disclose material fact in violation of implied duty of good faith constitutes breach of contract). Accordingly, it is not necessary for the Court to address Bear's other arguments regarding breach of contract.

## C. Punitive Damages

### 1. Fraudulent or Evil Motive

Bear argues that the Panel exceeded its powers in awarding punitive damages because there was no evidence of "fraudulent or evil motive" on the part of Bear, as required under New York law. Def. Mem. at 35 (quoting *Prozeralik v. Capital Cities Comm., Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 226, 626 N.E.2d 34 (1993)). Because I have determined that there was sufficient evidence to infer fraudulent intent, Bear's argument is not unavailing.

### 2. Disregard of Penalty Imposed by SEC

■ Bear also argues that the punitive damages award should be vacated because the Panel manifestly disregarded much of the penalty imposed on Bear by the SEC which, according to Bear, would sufficiently deter future fraudulent conduct. *See* Def. Mem. at 36–37. In arriving at the $1 million figure, the Panel specifically took into account the $30 million restitution fund Bear was required to provide for compensatory damages to Baron's customers. *See id.* (citing Award at 31). According to Bear, the Panel should also have taken into consideration the $5 million civil penalty as well as the requirement that Bear hire and adopt the findings of an independent consultant. *See id.* at 36–37 (citing Ex. C–7 at 18–19). The Panel was clearly aware of these additional penalties because it had the OIPs imposing those penalties. This Court has no authority to review the weight the arbitrators accorded to those penalties. *See Beth Israel Med. Ctr.*, 2000 WL 1364367, at *6; *Sobol*, 49 F.Supp.2d at 216. Because Bear has offered no legal authority requiring the Panel to reduce the punitive damage award any further than it did, the punitive damages award cannot be vacated on these grounds.

**17.** Assuming, arguendo, that Bear was under no duty to disclose Baron's commissions, this fact alone might not justify vacating the award. The fact of the matter is that Bear *did* disclose Baron's commissions. *See* C–1. Having made those disclosures, it was under a "duty of good faith and fair dealing" to do so honestly. As the Panel specifically found, the disclosures that Bear *did* make were "materially misleading," and "materially inaccurate." Award at 17–18.

**18.** Bear does not contend that Claimants did not rely on Bear's misstatements or omissions.

### 3. Public Policy

Bear also argues that the Panel's award of punitive damages is contrary to public policy because it affords a windfall to Claimants who were at least partially responsible for their own losses. A district court can only vacate an arbitration award on the basis of public policy if there is (1) "a violation of 'some explicit public policy'," and (2) "the award explicitly conflicts with 'law and legal precedents', as opposed to 'general considerations of supposed public interests'." *Alberti v. Morgan Stanley Dean Witter Reynolds, Inc.,* No. 97 Civ. 9385, 1998 WL 438667, at *6 (S.D.N.Y. July 31, 1998), *aff'd,* 205 F.3d 1321, 2000 WL 19090 (2d Cir.2000) (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). Bear correctly identifies an "explicit public policy" against awarding windfalls to persons who were themselves engaged in wrongful conduct. *See* Def. Mem. at 37 (citing *Barker v. Kallash,* 91 A.D.2d 372, 459 N.Y.S.2d 296, 298–99 (2d Dep't 1983)). However, it has failed to show that the $1 million punitive damages award "explicitly conflicts" with this public policy. The Award states that, in arriving at the $1 million figure, "[t]he panel took into account that Claimants' actions and inactions contributed to their losses." Award at 31. Thus, the punitive damages award reflected the very public policy considerations Bear claims were ignored.

### D. Attorneys' Fees

The Panel awarded Claimants $75,000 in attorneys' fees (out of the $248,443 requested) as a sanction for Bear's discovery violations. *See* Award at 7–8, 29. Bear seeks to vacate this award because, under New York law, arbitrators are precluded from awarding attorney's fees. *See* Def. Mem. at 38 (citing N.Y. C.P.L.R. § 7513). Bear acknowledges that NASD arbitrators may award "costs" under certain circumstances, *see* Def. Mem. at 38 (citing NASD Rule 10332(c)), but notes that "New York courts have held that the word 'costs does not include attorneys' fees," *id.* (quoting *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.,* 570 F.Supp. 870, 892 (S.D.N.Y.1983)).

Bear's argument fails for two reasons. *First,* Bear has not shown that the Panel was aware of this legal principle. The Award does not mention the rule against arbitrators awarding legal fees and Bear did not make this rule known to the Panel at the hearings or in its post-hearing brief. The only rule cited by the Panel is Section VIII of the NASD Notice to Members 99–90 which explicitly authorizes arbitrators to award attorneys' fees as a sanction for failure of a party to properly make discovery unless they find that there is substantial justification for the failure. *See* Award at 9, 29; *see also* NASD Notice to Members 99–90, Ex. E to Lagemann Dec. No. 1, at 691. The Panel specifically found that Bear made "no showing of substantial justification" that would spare it from sanctions. Award at 9.

*Second,* Bear has misstated New York law. Courts have held that, consistent with section 7513, arbitrators *may* award attorneys' fees if either (1) the parties' agreement to arbitrate so provides, *see* *Spector v. Torenberg,* 852 F.Supp. 201, 210 (S.D.N.Y.1994) (citing N.Y. C.P.L.R. § 7513), or (2) the parties acquiesce to the payment of attorneys' fees, *see id.; GPR, Inc. v. Phoenix Petroleum Co.,* No. 95 Civ. 0395, 1995 WL 314709, at *1 (S.D.N.Y. May 24, 1995).[19] A party can acquiesce to

---

19. N.Y. C.P.L.R. § 7513 states: "Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including attorneys' fees, incurred in the conduct of the arbitration, shall be paid as provided in the award." *Id.*

the award of attorneys' fees by either making its own demand for attorneys' fees or by failing to object to the other party's demand for such fees. *See Spector*, 852 F.Supp. at 210. Here, Claimants' post-hearing brief specifically requested legal fees as a discovery sanction against Bear. *See* Pl. Post–Hear. Mem. at 13–14. Although Bear argued that its actions did not warrant a sanction, it never raised a *legal objection* to the award of attorneys' fees. *See* Def. Post–Hear. Mem. at 16–18. Because Bear never maintained, as it does here, that attorneys' fees are unlawful, it implicitly conceded that it was within the Panel's authority to award such fees.

### E. Evidentiary Rulings

Bear contests three of the Panel's evidentiary rulings: (1) the exclusion of excerpts from the SEC's deposition of John LaFond, one of the NASD regulators responsible for Baron, which was an exhibit to the Wells Submission, *see* Def. Mem. at 17 & n. 15, 34 n. 25; (2) the exclusion of Okin's testimony in McAndris' criminal trial, which was also an exhibit to the Wells Submission, *see id.* at 18; and (3) the acceptance of the OIP related to BSSC into evidence, *id.* Def. Repl. at 6–7.

#### 1. LaFond's and Okin's Testimony

█ Bear contends that it was "substantially prejudiced" by the exclusion of LaFond's deposition testimony because that testimony would have established that "there is nothing extraordinary about a clearing firm having contact with the NASD concerning the net capital of one of its introductory firms." Def. Mem. at 34 n. 25. Bear claims that Okin's testimony was improperly excluded because that testimony would have helped to explain how Baron tried to hide its conduct from Bear. *See id.* at 18–20.

The Panel provided a number of explanations for its decision to exclude the testimony attached to the Wells Submission. *First,* the Panel explained that much of the testimony was hearsay. *See* 4/26/01 Tr. at 51. *Second,* the Panel explained that "depositions aren't favored in arbitration," particularly where those depositions were not "taken in anticipation of this proceeding." *Id. Third,* the Panel noted that, if Bear needed to address some of the issues in the excluded exhibits, it could call witnesses to testify about those issues. *Id.* ("[I]f there are witnesses that have to be produced, in order to deal with some of these issues [in the excluded depositions and trial testimony], so be it."). In addition, much of the purportedly excluded testimony was actually received into evidence because it was summarized and referenced in the body of the Wells Submission.[20] *See* RX–27, at 30 (referring to LaFond Deposition); *id.* at 23, 31–32, 40 (referring to Okin testimony). Given the Panel's reasoned explanation for excluding LaFond's and Okin's testimony and its acceptance of Bear's summary of the relevant portions of that testimony, Bear has not shown that the Panel violated "fundamental fairness." *Polin,* 103 F.Supp.2d at 261.

**20.** While the Panel excluded the "quotes from depositions" that were contained in the Wells Submissions, *see* 4/26/01 Tr. at 51, it permitted Bear to quote sections of the Wells Submission that summarized and referenced the excluded testimony, *see id.* at 53–54. Counsel for Claimants argued it would be "really quite prejudiced by" allowing Bear to "refer to and quote from," the very depositions and trial transcripts [the Panel] ha[s] excluded." *Id.* at 53. In response, the Panel explained that it would accept that evidence but "regard those [references] for what they're worth," "take into account that Mr. Okin isn't here to testify," and give Bear's evidence "the weight to which it's entitled, taking all of that into consideration." *Id.* at 53–54.

### 2. The OIP Related to BSSC

■ Bear argues that the Panel erroneously received into evidence the OIP related to BSSC because it was a settlement agreement with the SEC. *See* Def. Repl. at 6 (citing Ex. C–7 at 1 n. 1). According to Bear, settlement agreements between private companies and federal agencies cannot be used in subsequent litigation. *See id.* (citing *e.g., Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976); *In re Alder, Coleman Clearing Corp.*, No. 95–08203, 97/8423A, 1998 WL 160036, at *8 (Bankr.S.D.N.Y. Apr.3, 1998)).

Although not bound by the Federal Rules of Evidence, the Panel explicitly recognized the rules precluding the use of settlement agreements as admissions or evidence of guilt. The Panel stated that it would not consider the OIPs "binding on the panel or preclusive in any way, that the findings would not be regarded as res judicata or collateral estoppel, they would [not] be considered as an admission of facts or liability by Bear or shift the burden of proof from Claimants to Bear." Award at 10. It also stated that "it would not consider and would disregard the 'settlement' provisions in the SEC Consent Orders ... and [would] consider only the factual findings and evidentiary materials set forth in the SEC Consent Orders." *Id.*

Instead, the Panel admitted the OIPs pursuant to Rule 803(8)(c) of the Federal Rules of Evidence, which excepts from the hearsay rule statements setting forth, in civil actions and proceedings, factual findings resulting from an investigation made pursuant to authority granted by law. *See id.;* Plaintiffs' Motion in Limine 2–4, Ex. A to 10/22/01 Declaration of Jonathan Kord Lagemann ("Lagemann Dec. No. 2"). As the Panel explained, it considered the SEC findings of fact as simply one type of evidence offered for its consideration. The Panel stated that it "would consider the weight, relevance and materiality of the findings as well as the parties' arguments in that regard, any other evidence relevant to the issues set forth in the SEC findings and would not necessarily conclude that the SEC findings establish a prima facie case for Claimants." Award at 10. It also stated that it would not "defer to the findings of the SEC contrary to the duty of the panel to find the facts in this arbitration." *Id.*

Finally, the Panel made a conscious effort to ensure that Bear had an opportunity to rebut the SEC's findings. When admitting the Wells Submission, the Panel explained that it sought to give Bear a type of "rebuttal" against the OIPs in order to ensure "an element of fairness." 4/26/01 Tr. at 51. Thus, the Panel did not manifestly disregard the law, exceed its authority, or violate "fundamental fairness" when it admitted the OIP related to BSSC into evidence.

## IV. CONCLUSION

For the foregoing reasons, Bear's motion to vacate the Award is denied and Claimants' motion to confirm the Award is granted. Consistent with the Award, the following judgment is hereby entered against Bear:

1. Compensatory damages in the amount of $600,000.00, which is completely offset by SIPC payments to Claimants;

2. Prejudgment interest equal to $211,571.60, which is offset by SIPC payments to Claimants in the amount of $143,436.00, resulting in a balance of $68,135.60 which remains due to Claimants;

3. Punitive damages in the amount of $1,000,000.00;

4. A sanction for delay in the amount of $25,000.00 (and it shall pay two thirds of the forum fees);

5. Legal fees in the amount of $75,000.00;

6. Interest at the rate of 9% per annum simple interest on the remaining amount due ($1,168,135.60) if that amount was not paid within thirty (30) days of the Award, which interest shall commence thirty (30) days from the date of the Award on any amount remaining due.

SO ORDERED.